Nebraska Supreme Court Online Library
www.nebraska.gov/courts/epub/
03/18/2016 09:18 AM CDT

State of Nebraska, appellee, v.
Andrew Casterline, appellant.
___ N.W.2d ___

Filed March 18, 2016.    No. S-15-045.

1. **Criminal Law: Evidence: Appeal and Error.** In reviewing a criminal
   conviction for a sufficiency of the evidence claim, whether the evidence
   is direct, circumstantial, or a combination thereof, the standard is the
   same: An appellate court does not resolve conflicts in the evidence, pass
   on the credibility of witnesses, or reweigh the evidence; such matters are
   for the finder of fact.
2. ____: ____: ____. The relevant question when an appellate court
   reviews a sufficiency of the evidence claim is whether, after viewing the
   evidence in the light most favorable to the prosecution, any rational trier
   of fact could have found the essential elements of the crime beyond a
   reasonable doubt.
3. **Rules of Evidence: Appeal and Error.** When the Nebraska Evidence
   Rules commit the evidentiary question at issue to the discretion of the
   trial court, an appellate court reviews the admissibility of evidence for
   an abuse of discretion.
4. **Trial: Evidence: Appeal and Error.** An appellate court reviews the
   trial court's conclusions with regard to evidentiary foundation and wit-
   ness qualification for an abuse of discretion.
5. **Jury Instructions.** Whether the jury instructions given by a trial court
   are correct is a question of law.
6. **Judgments: Appeal and Error.** When reviewing questions of law, an
   appellate court resolves the questions independently of the conclusion
   reached by the lower court.
7. **Robbery: Words and Phrases.** A person commits robbery if, with the
   intent to steal, he forcibly and by violence, or by putting in fear, takes
   from the person of another any money or personal property of any
   value whatever.

8. **Aiding and Abetting.** A person who aids, abets, procures, or causes another to commit any offense may be prosecuted and punished as if he were the principal offender.

9. **Aiding and Abetting: Proof.** Aiding and abetting requires some participation in a criminal act which must be evidenced by word, act, or deed, and mere encouragement or assistance is sufficient to make one an aider or abettor. No particular acts are necessary, however, nor is it necessary that the defendant take physical part in the commission of the crime or that there was an express agreement to commit the crime.

10. ____: ____. Evidence of mere presence, acquiescence, or silence is not enough to sustain the State's burden of proving guilt under an aiding and abetting theory.

11. **Homicide: Robbery: Intent: Time.** There is no statutory requirement that the intent to rob be formed at any particular time as long as the homicide occurs as the result of acts committed while in the perpetration of the robbery.

12. **Evidence: Proof.** The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

13. **Rules of Evidence: Proof.** Neb. Evid. R. 901, Neb. Rev. Stat. § 27-901 (Reissue 2008), does not impose a high hurdle for authentication or identification.

14. ____: ____. A proponent of evidence is not required to conclusively prove the genuineness of the evidence or to rule out all possibilities inconsistent with authenticity. If the proponent's showing is sufficient to support a finding that the evidence is what it purports to be, the proponent has satisfied the requirement of Neb. Evid. R. 901(1), Neb. Rev. Stat. § 27-901(1) (Reissue 2008).

15. **Trial: Evidence.** Authentication rulings are necessarily fact specific, so a trial court has discretion to determine whether evidence has been properly authenticated.

16. **Trial: Waiver: Appeal and Error.** Failure to make a timely objection waives the right to assert prejudicial error on appeal.

17. **Trial: Evidence: Appeal and Error.** On appeal, a defendant may not assert a different ground for his objection to the admission of evidence than was offered at trial.

18. **Jury Instructions: Proof: Appeal and Error.** In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant.

19. **Jury Instructions: Appeal and Error.** All the jury instructions must be read together, and if, taken as a whole, they correctly state the law,

are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal.

Appeal from the District Court for Webster County: STEPHEN R. ILLINGWORTH, Judge. Affirmed.

Charles D. Brewster, of Anderson, Klein, Swan & Brewster, for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

HEAVICAN, C.J., WRIGHT, CONNOLLY, MILLER-LERMAN, CASSEL, and STACY, JJ., and RIEDMANN, Judge.

WRIGHT, J.

## I. NATURE OF CASE

Andrew Casterline appeals from his convictions following a jury trial for first degree murder, use of a deadly weapon to commit a felony, and burglary. He claims the evidence was insufficient to support his convictions for the first two offenses. He also assigns that the district court erred in admitting certain evidence and in including certain language in its instructions to the jury. For the reasons set forth below, we affirm.

## II. BACKGROUND

Casterline moved to Guide Rock, Nebraska, with his mother, Shelley Casterline (Shelley), who wanted to start a new life after she was released from prison. Shelley had maintained an "on again, off again" relationship with Ronald Jamilowski, the father of her twin daughters. Casterline lived with Shelley and Jamilowski for a few months, but then moved into the house next door, which was another property Jamilowski owned. Jamilowski's mother, Virginia Barone, who was the victim, lived nearby.

The relationship between Casterline, Shelley, Jamilowski, and Barone was quite volatile. Although they saw each

other daily, none of them got along very well. Shelley and Jamilowski had tried to rekindle their relationship, but they argued and got into physical altercations frequently, due mostly to Jamilowski's drinking. Shelley and Barone often fought about money and about Shelley's relationship with Jamilowski, of which Barone apparently did not approve. Casterline got into arguments with Shelley, and he was known to have "hated" Jamilowski.

### 1. EVENTS SURROUNDING KILLING

During the early evening on October 3, 2013, Casterline went to Hastings, Nebraska, to run errands with his friend, Trevor Marihugh, who lived across the street from Casterline, Shelley, and Jamilowski. They took Marihugh's vehicle, because Casterline's was not working. Both Casterline and Marihugh were abusing prescription medications, and Marihugh ended up getting arrested for driving under the influence. Around 3 a.m. the next day, Casterline called Shelley and said that he needed a ride home from Hastings because Marihugh was in jail. Shelley woke up Jamilowski and Barone, because Barone was the only one with a car, and the three of them drove to Hastings to pick up Casterline. On the way back to Guide Rock, Jamilowski and Casterline were fistfighting in the back seat, while Shelley and Barone were arguing in the front seat. Barone even pulled over at one point and tried to throw Shelley out of the vehicle. They continued to Guide Rock, and they all went to their respective homes.

Just after 9 a.m., Casterline was seen using Barone's automatic teller machine (ATM) card at a bank in Superior, Nebraska. A bank employee testified that she went out to service the ATM and observed a young man standing at the ATM and an older white or light-colored vehicle parked close by. She identified Casterline as the man at the ATM. She observed a middle-aged woman sitting in the passenger seat, who was later determined to be Shelley, and there were various things in the back seat, including a guitar case. The bank employee testified that it was very obvious that Casterline did

not want her to see what he was doing. After about 5 minutes, the woman in the passenger seat got out and spoke to Casterline, at which point they both got back into the vehicle and drove away.

The transaction history for Barone's account confirmed that several transactions occurred on Barone's account on the morning of October 4, 2013. A "debit balance inquiry" occurred at 9:18 a.m., followed by a withdrawal of $500 at 9:19 a.m. There were several more attempted withdrawals over the next couple of minutes, but those attempts were denied due to the $500 daily ATM withdrawal limit. The bank employee explained that in order to withdraw cash from an ATM using a debit card, one must have the personal identification number (PIN) for that card, which is selected by the card owner and is not retained by the bank. In the event a customer loses his or her PIN, the card must be canceled and a new card must be ordered, because it is not possible for the bank to retrieve a PIN; that information is destroyed as soon as the card is created.

Throughout that day, Casterline and Shelley stopped at various places to get more money—including the Wal-Mart stores in Hastings; Grand Island, Nebraska; and York, Nebraska—where they used Barone's debit card to make numerous small purchases and got large sums of cash back with each purchase. Between their purchases and withdrawals, Casterline and Shelley stole more than $2,000 from Barone, which nearly emptied her bank account. At approximately 1:30 p.m., they stopped at a pawn shop in Grand Island and sold several things, including a television, a video game system with 13 games, and an amplifier for a guitar, for which they received a total of $309.

While traveling in Barone's vehicle on Interstate 80 near Plattsmouth, Nebraska, Casterline and Shelley were stopped about 7:40 p.m. for a traffic violation. The officer who made the stop testified that Casterline appeared to be under the influence of prescription drugs. He observed that Casterline's nails were dirty and he had several nicks and cuts on his hands. Casterline told the officer that the vehicle belonged to his

grandmother and that she was letting him borrow it to go to his grandfather's funeral in Pennsylvania. Casterline was arrested for driving under the influence and taken to the Plattsmouth jail. Shelley was released, but Barone's vehicle was impounded because Shelley did not have a valid driver's license.

At approximately 9:30 p.m., Marihugh returned home to Guide Rock and discovered that his house had been burglarized. Several things were missing, including his television, his video game system with several games, two laptop computers, two guitars, and an amplifier. He reported the burglary to law enforcement, who discovered that some of the items stolen from his house had been sold to a pawn shop in Grand Island by Casterline and Shelley. Marihugh testified that he did not give Casterline or Shelley permission to go into his house and take any items.

The next morning, law enforcement received a telephone call from one of Barone's neighbors requesting a welfare check at Barone's house. A sheriff's deputy entered the home with the neighbor and found that several pieces of furniture had been knocked over. The officer followed a trail of blood to a back room and found Barone dead under a pile of boards. Barone had sustained multiple stab wounds and several cuts on her fingers, which appeared to be defensive wounds from trying to block a sharp object. She had some small drops of blood on her face, which suggested that she may have been breathing for some time after she was stabbed and had breathed out blood.

Investigators observed a bloodstain on a rug in the living room, a shoe in the living room with blood on it, blood smears which appeared to be drag marks leading from the living room to the room where Barone's body was found, and drops of blood on the porch area outside the front door. The telephone appeared to have been ripped out of the wall, and a number of things were lying in the driveway where Barone normally parked her vehicle. Investigators found no financial devices in Barone's purse, and her vehicle, a white 1995 Pontiac, was missing.

During the investigation, Jamilowski arrived at Barone's house and was detained for questioning. After speaking with Jamilowski, law enforcement officers identified Casterline and Shelley as suspects in Barone's death. They learned that Casterline had been arrested the night before in Cass County while driving Barone's vehicle, but had since been released, and that he and Shelley were believed to be heading east through Iowa in a stolen Jeep. Police were able to track Shelley's cell phone to a location near Newton, Iowa. Authorities in Iowa were notified and performed a traffic stop on the stolen Jeep, and identified the occupants as Casterline and Shelley.

Upon searching Casterline, officers located $322 cash, several Wal-Mart and ATM receipts, and Barone's debit card. Shelley had over $2,000 in her purse. A search of the Jeep revealed a bag with Marihugh's name on it, two laptop computers, and a knife with a 4-inch blade inside the glovebox. The owner of the Jeep testified that none of those items were in the Jeep when it was stolen from a parking lot in Plattsmouth the day before.

Casterline and Shelley were arrested and taken to a detention center in Iowa. At the time of booking, officers observed various injuries. Shelley had a bruise on her right arm and some small scrapes on her right wrist and index finger. Casterline had a bruise above his eye, cuts on the thumb and fingers of his right hand, an abrasion on his left forearm, and dried blood on his right palm. Officers collected DNA samples and fingernail scrapings from Casterline and Shelley and collected the clothing that they were wearing. Casterline was reluctant to give the officers his clothing.

## 2. INVESTIGATION

Casterline and Shelley were interviewed by investigators the following day. Shelley initially denied having anything to do with Barone's death, but later admitted to killing Barone. She claimed Casterline had nothing to do with it. Shelley told investigators that when they got back from Hastings, she and Casterline went to Barone's house and the three of them

argued. Barone was blaming Shelley for Jamilowski's problems, at which point Casterline told Barone to shut up or he would knock her out.

Shelley stated that she grabbed a knife and began stabbing Barone, then dragged Barone into another room and covered her body with boards. She said that Casterline was there when she killed Barone but that he had nothing to do with the killing. However, she acknowledged that she was taking blame for the murder in order to "save [Casterline's] life."

When Casterline was interviewed, he claimed that he and Shelley had nothing to do with Barone's death and that he had no idea Barone was dead. He later admitted that he was at Barone's house when Barone and Shelley got into an argument, but claimed that he went home during the argument and did not know how Barone died. Later during the interview, however, Shelley began screaming from another room that she killed Barone, at which point Casterline stated that Shelley did it but maintained that he had nothing to do with Barone's death.

Investigators performed DNA testing on the knife found in the Jeep and the clothing that Casterline and Shelley were wearing when they were apprehended. They compared those results to known DNA samples from Casterline, Shelley, Barone, Jamilowski, and Marihugh. They located DNA on the blade of the knife and on three pieces of clothing: Casterline's jeans, Casterline's shoe, and Barone's sweatpants. The DNA on the knife was a mixture of two individuals, with Casterline being the major contributor and everyone except Shelley being excluded as the minor contributor. The DNA on Casterline's jeans tested positive for blood and was a mixture of two contributors, with Barone being the major contributor and everyone except Casterline being excluded as the minor contributor. The DNA on Casterline's shoe also tested positive for blood and matched the DNA profile of Barone only. The DNA on Barone's sweatpants was inconclusive as to the major contributor, but everyone except Casterline, Shelley, and Barone being excluded as a minor contributor.

The forensic pathologist who conducted the autopsy concluded that Barone's death was a homicide. The autopsy revealed that Barone sustained 22 stab wounds, which varied from ½ to 8½ inches in depth. The angle of the stab wounds also varied. Seven of the wounds were inflicted at a downward trajectory, and 13 were inflicted at an upward trajectory. The pathologist testified that more than one knife may have been used to stab Barone, although she could not confirm whether that was actually the case. She explained that it is possible for a knife to inflict wounds deeper than its blade length, due to the way the body reacts when it is punctured. She concluded that the cause of Barone's death was stab wounds to the chest, upper arm, and abdomen, which caused her to bleed out and die from loss of blood.

### 3. Shelley's Testimony

Shelley testified for the defense. She testified that she alone killed Barone and that Casterline had nothing to do with it. She explained that shortly after they arrived home from Hastings, she walked to Barone's house with the intention of retrieving her cell phone, which she had left in Barone's car. She and Barone got into an intense argument that was about to turn physical, when Casterline entered the house looking for Shelley. Shelley told Casterline to get out of the house, which he did. Shelley then grabbed a knife and stabbed Barone multiple times. Shelley said Casterline came back into the house and saw Barone lying on the floor. She decided to drag Barone's body into another room and convinced Casterline to help her. Shelley then told Casterline to pack his things because they were leaving town. She admitted that before leaving, they went to Marihugh's house and took several items of his personal property, and then left town in Barone's car. She admitted they used Barone's debit card to obtain money at an ATM and by doing "cash back" transactions at three Wal-Mart stores in central Nebraska.

At trial, several details of Shelley's testimony were inconsistent with what she told investigators when she was interviewed

in Iowa following her arrest. For example, she testified at trial that Casterline was not at Barone's house when she stabbed Barone, whereas in her prior interview, she said that he was present during the killing. She testified that Casterline helped her move Barone's body after the stabbing, but in her prior interview she said that she alone moved the body. Finally, she testified at trial that she took Barone's ATM card and called the bank to get the PIN, whereas in her prior interview, she said that she knew nothing about the use of Barone's ATM card and that investigators would have to talk to Casterline about that. Shelley acknowledged several of the inconsistencies on cross-examination, but stated that her trial testimony was the truth and that she must have been misremembering things during her prior interview due to having been under the influence of prescription drugs at that time.

On cross-examination, Shelley acknowledged that she wrote a letter to one of her daughters stating that two knives may have been involved in the murder, but claimed at trial that that was not true and that she was just misremembering what happened. Shelley acknowledged that she told her daughter that Barone struck Casterline, but claimed at trial that that was not true either and that she lied to her daughter. Shelley acknowledged that prior to trial, she wrote a letter to her daughter, who in turn wrote to Casterline, about there being blood on him because Shelley made him move the body, but Shelley denied that she was attempting to coordinate their testimony.

### 4. Verdicts and Sentencing

The jury found Casterline guilty on all three charges. Casterline was sentenced to consecutive terms of life imprisonment for first degree murder, 49 to 50 years' imprisonment for use of a deadly weapon to commit a felony, and 19 to 20 years' imprisonment for burglary. This timely appeal followed.

### III. ASSIGNMENTS OF ERROR

Casterline assigns, combined and restated, that the district court erred in (1) finding sufficient evidence to sustain

his convictions for first degree murder and use of a deadly weapon to commit a felony; (2) admitting into evidence without proper foundation a letter that was purportedly written by Casterline while in jail following his arrest; (3) admitting into evidence, over Casterline's relevance objection, the knife that was found in the Jeep in which Casterline and Shelley were traveling when they were apprehended; and (4) improperly instructing the jury on the elements of first degree murder, second degree murder, and manslaughter by adding language that Casterline was guilty if he acted "either alone or by aiding another," and by refusing Casterline's proposed elements instructions.

## IV. STANDARD OF REVIEW

[1,2] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.[1] The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[2]

[3,4] When the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.[3] An appellate court reviews the trial court's conclusions with regard to evidentiary foundation and witness qualification for an abuse of discretion.[4]

---

[1] *State v. Escamilla*, 291 Neb. 181, 864 N.W.2d 376 (2015).

[2] *Id.*

[3] *State v. Johnson*, 290 Neb. 862, 862 N.W.2d 757 (2015).

[4] *State v. Henderson*, 289 Neb. 271, 854 N.W.2d 616 (2014).

[5,6] Whether the jury instructions given by a trial court are correct is a question of law.[5] When reviewing questions of law, an appellate court resolves the questions independently of the conclusion reached by the lower court.[6]

## V. ANALYSIS

### 1. Sufficiency of Evidence

Casterline claims there was insufficient evidence to sustain his convictions for first degree murder and use of a deadly weapon to commit a felony. He does not dispute that the evidence was sufficient to find him guilty of burglary.

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.[7] The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[8]

### (a) Essential Elements

[7] Casterline was charged with first degree murder under the alternative theories of premeditated murder and felony murder. In order to find him guilty of first degree murder, the State had to prove that Casterline killed Barone, either alone or by aiding another, and that he did so either (1) purposely and with deliberate and premeditated malice or (2) while in the perpetration of a robbery.[9] A person commits robbery if, with

---

[5] *State v. Armagost*, 291 Neb. 117, 864 N.W.2d 417 (2015).

[6] *Id.*

[7] *State v. Escamilla, supra* note 1.

[8] *Id.*

[9] See Neb. Rev. Stat. § 28-303 (Reissue 2008).

the intent to steal, he forcibly and by violence, or by putting in fear, takes from the person of another any money or personal property of any value whatever.[10]

Casterline was also charged with use of a deadly weapon to commit a felony, which, in this case, was the murder of Barone. To find him guilty of this offense, the State had to prove that Casterline, either alone or by aiding another, knowingly and intentionally used a deadly weapon to murder Barone.

[8-10] The jury was instructed in this case that it could convict Casterline of these crimes either as the principal offender or as an aider and abettor. A person who aids, abets, procures, or causes another to commit any offense may be prosecuted and punished as if he were the principal offender.[11] Aiding and abetting requires some participation in a criminal act which must be evidenced by word, act, or deed, and mere encouragement or assistance is sufficient to make one an aider or abettor.[12] No particular acts are necessary, however, nor is it necessary that the defendant take physical part in the commission of the crime or that there was an express agreement to commit the crime.[13] Yet, evidence of mere presence, acquiescence, or silence is not enough to sustain the State's burden of proving guilt under an aiding and abetting theory.[14]

### (b) Evidence Against Casterline

We review the State's evidence against Casterline to determine whether any rational trier of fact could have found the essential elements of first degree murder and use of a deadly weapon to commit a felony beyond a reasonable doubt. We conclude that the record contains sufficient evidence to sustain Casterline's convictions on both counts.

---

[10] Neb. Rev. Stat. § 28-324(1) (Reissue 2008).

[11] Neb. Rev. Stat. § 28-206 (Reissue 2008).

[12] *State v. Leonor*, 263 Neb. 86, 638 N.W.2d 798 (2002).

[13] *Id.*

[14] *Id.*

At trial, the evidence showed that Casterline stole Barone's vehicle and used her debit card to steal nearly $2,000 from her bank account, which occurred the day before Barone was found dead. Although Shelley claimed responsibility for the stabbing, there was blood on Casterline's shoe and pant leg which matched Barone's DNA. There was no blood or DNA found on Shelley's clothing. Additionally, Shelley told police that Casterline was present during the killing and there was evidence that more than one knife may have been used due to the varying depths and trajectories of the stab wounds. Shelley's letter to her daughter indicated that more than one knife may have been used. Police found a knife with a 4-inch blade in the vehicle in which Casterline and Shelley were traveling when they were apprehended. The blade of the knife contained Casterline's DNA.

A rational trier of fact could conclude that Shelley and/or Casterline used force, violence, and/or fear to obtain Barone's car keys, debit card, and PIN at some point before, during, or shortly after the stabbing, while Barone was still alive. Contrary to Shelley's testimony that she obtained Barone's PIN by calling the bank, there was testimony from a bank employee that it was impossible for the bank to retrieve a customer's PIN, because the bank destroys that information after the card is created. Thus, the evidence supports a finding that Casterline aided and abetted or used force to obtain Barone's PIN from Barone before she died. This evidence is sufficient to support a finding that Casterline, either alone or by aiding Shelley, killed Barone during the commission of a robbery.

[11] Casterline argues that there was no evidence that he intended to rob Barone until after the murder had been completed by Shelley. Even if this fact was true, it would not absolve him of liability for felony murder. There is no statutory requirement that the intent to rob be formed at any particular time as long as the homicide occurs as the result of acts

committed while in the perpetration of the robbery.[15] Barone's death occurred while in the perpetration of a robbery, because the act that killed her, the stabbing, was closely connected in time and place with the robbery, so the act and the robbery may be considered one continuous occurrence.

Regarding Casterline's conviction for use of a deadly weapon to commit a felony, the evidence was undisputed that Barone was stabbed to death. The 22 stab wounds varied from ½ to 8½ inches in depth and were inflicted at two different trajectories, suggesting that more than one knife may have been used. When Casterline and Shelley were apprehended, officers located a knife in the vehicle in which they were traveling, and Casterline's DNA was located on the blade of the knife. Casterline argues that the evidence failed to prove that he was in possession of a weapon while a felony was being committed. We find that a rational trier of fact could conclude that he was. Even if the jury concluded that Casterline did not actually wield a knife during the stabbing, it could have found him guilty of aiding and abetting Shelley's use of a knife to commit the murder.[16]

We conclude that there was sufficient evidence to sustain the jury's guilty verdicts.

## 2. ADMISSIBILITY OF LETTER

Casterline argues that the district court erred in admitting a letter purportedly written by him to Jamilowski while he was in jail in Iowa following his arrest. Casterline objected to the admission of the letter and claims it should have been excluded because the State failed to lay sufficient foundation under Neb. Evid. R. 901, Neb. Rev. Stat. § 27-901 (Reissue 2008).

---

[15] See *State v. Montgomery*, 191 Neb. 470, 215 N.W.2d 881 (1974).

[16] See, *State v. Kitt*, 284 Neb. 611, 823 N.W.2d 175 (2012); *State v. Leonor, supra* note 12.

(a) Additional Relevant Facts

The letter in question was received into evidence during the testimony of the chief jailer at the detention center in Iowa where Casterline and Shelley were held after their arrest. The jailer testified regarding the jail's policy to monitor all mail unless it is privileged, such as attorney-client communications. A jailer scans the mail for inappropriate materials and then documents all incoming and outgoing mail in the jail's computerized database. The letter in question was documented as outgoing mail in the database. A printout from the database entitled "Jasper County Sheriff Inmate Activity Log Report" was received into evidence. It contains Casterline's full name, inmate number, and jail cell number, and reflects that he mailed this letter to Jamilowski on October 10, 2013. The return address on the letter contains Casterline's name and address at the jail. The letter, in its entirety, states:

Hey Ronnie this is aj writing you. For what reason I don't know I never did like you because of the way you treated my mother. you are an alcoholic but's its okay to be. you spent 12 years in prison. Well me and mom are locked up because she needed money and a car to get away from you that is how much she hated you but anyways Im getting some of the Blame for her mistakes. I have just heard what happened to your mom and Im so sorry I couldn't Imagine losen mine. But the cops are trying to blame me for that, but you know who really did it. I am writing you with simpity because I care about you and want you to write me back I still consider you a father. And when I get out of jail I would like to move back to guide rock. Tell Trevor my mom is the one who took his stuff you know how she is and tell trevor I dont wanna lose his friendship and tell him he can write me too he is like my brother. Candy and Sam wont talk to me on the phone can you send me there addresses and give them mine please? Well Ronnie Im going to leave it up to you to forgive me but please forgive and write back. lol put down that bottle.

And dont forget to tell trevor and everybody how sorry I am for my moms mistakes. you know Im not that person. Soo take care of yourself and pay your bills.
 PS. Send me a picture of my sisters and mom.

### (b) Analysis

[12-14] The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.[17] Rule 901 does not impose a high hurdle for authentication or identification.[18] A proponent of evidence is not required to conclusively prove the genuineness of the evidence or to rule out all possibilities inconsistent with authenticity.[19] If the proponent's showing is sufficient to support a finding that the evidence is what it purports to be, the proponent has satisfied the requirement of rule 901(1).[20]

[15] A proponent may authenticate a document under rule 901(2)(a) by the testimony of someone with personal knowledge that it is what it is claimed to be, such as a person familiar with its contents.[21] But that is not the exclusive means. Under rule 901(2)(d), a proponent may authenticate a document by circumstantial evidence, or its "'[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.'"[22] Authentication rulings are necessarily fact specific, so a trial court has discretion to determine whether evidence has been properly authenticated.[23]

---

[17] § 27-901(1).

[18] *State v. Elseman*, 287 Neb. 134, 841 N.W.2d 225 (2014).

[19] *Id.*

[20] *Id.*

[21] *State v. Draganescu*, 276 Neb. 448, 755 N.W.2d 57 (2008).

[22] *Id*. at 473, 755 N.W.2d at 82.

[23] See *State v. Taylor*, 282 Neb. 297, 803 N.W.2d 746 (2011).

We find that the foundational evidence set forth above was sufficient to support a finding under rule 901 that the letter was what it purported to be, a letter from Casterline to Jamilowski. In addition to the testimony of the chief jailer, the substance of the letter provides further authentication, because it contained personal information and facts of which others would not likely have knowledge. We find that the letter was sufficiently authenticated, and the district court did not abuse its discretion in overruling Casterline's foundation objection.

### 3. Admissibility of Knife

Casterline argues that the district court erred by admitting into evidence, over his relevance objection, the knife that was found in the Jeep in which he and Shelley were traveling when they were apprehended in Iowa. He further argues that even if relevant, the knife should have been excluded under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2008), because its probative value was outweighed by the danger of unfair prejudice.

[16,17] The State argues that Casterline has waived this issue because he failed to timely object to the knife at trial. The record supports the State's assertion that Casterline did not object to the knife on relevance grounds until after two witnesses had testified about the knife's being found in the glovebox and two pictures of the knife had been offered and received into evidence without objection. It is well settled that failure to make a timely objection waives the right to assert prejudicial error on appeal.[24] The record further reflects that Casterline did not raise an objection to the knife on grounds of rule 403 at any point during the trial. On appeal, a defendant may not assert a different ground for his objection to the admission of evidence than was offered at trial.[25]

---

[24] See *State v. Oliveira-Coutinho*, 291 Neb. 294, 865 N.W.2d 740 (2015).

[25] *State v. Ramirez*, 287 Neb. 356, 842 N.W.2d 694 (2014).

Even if these objections had not been waived, we conclude the knife was clearly relevant and admissible under rule 403, given that it was found in the vehicle Casterline was driving, it contained Casterline's DNA, and the victim in this case was stabbed to death. The district court did not err in admitting the knife into evidence.

### 4. Jury Instructions

Casterline makes two arguments with respect to the jury instructions. First, he argues that the district court improperly instructed the jury on the elements of first degree murder, second degree murder, and manslaughter by adding language that he was guilty of those crimes if he acted "either alone or by aiding another." He argues that that language is not contained in the pattern jury instructions and improperly emphasized the prosecution's theory of aiding and abetting.

Second, Casterline argues that the district court erred by refusing his proposed elements instruction, which was taken directly from the Nebraska pattern jury instructions and was identical to the court's instructions except that it omitted the language "either alone or by aiding another." Casterline argues this language clearly confused the jury, as evidenced by the fact that the jury submitted a written question to the trial court during deliberations, which stated: "Could we get a copy of the State Law that states how you are guilty by association?"

[18,19] In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant.[26] All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal.[27]

[26] *State v. Abram*, 284 Neb. 55, 815 N.W.2d 897 (2012).

[27] *State v. Watt*, 285 Neb. 647, 832 N.W.2d 459 (2013).

To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.[28]

The district court instructed on the alternate theories of either premeditated murder or felony murder. The jury was instructed as follows:

> [T]he charge may be based on either premeditated murder or felony murder, and it matters not if some jurors arrive at a verdict of guilty of First Degree Murder based on proof of premeditated murder and some jurors arrive at the same verdict based on proof of felony murder so long as each juror is convinced that the State has proved beyond a reasonable doubt that the defendant committed either premeditated murder or felony murder.

The jury was then instructed on the elements of premeditated murder and felony murder as follows:

> The elements which the State must prove by evidence beyond a reasonable doubt in order to convict . . . Casterline of First Degree Murder, are:
>
> I.) PREMEDITATED MURDER
>
> . . . That . . . Casterline, either alone or by aiding another, killed . . . Barone . . . on or about October 4, 2013 . . . in Webster County, Nebraska . . . purposely . . . with deliberate and premeditated malice.
>
> II.) FELONY MURDER
>
> . . . That . . . Casterline, either alone or by aiding another, killed . . . Barone . . . on or about October 4, 2013 . . . in Webster County, Nebraska . . . during the perpetration of or an attempt to perpetrate the crime of burglary and/or the crime of robbery; and . . . [t]hat such burglary, attempted burglary, robbery or attempted

---

[28] *State v. Morgan*, 286 Neb. 556, 837 N.W.2d 543 (2013).

robbery respectively, consisted of each and every one of the following elements.

The instruction also set forth the elements of burglary, attempted burglary, robbery, and attempted robbery.

The State argues that the additional language, "either alone or by aiding another," was correct because one who aids and abets a crime may be held liable as the principal. We agree. A person who aids, abets, procures, or causes another to commit any offense may be prosecuted and punished as if he were the principal offender.[29] We have previously upheld an elements instruction containing nearly identical language.[30] We find that the additional language complained of was warranted by the evidence, was a correct statement of the law, and, when read in conjunction with the other instructions, adequately presented the law of felony murder and an aider and abettor's criminal liability as principal.

We also reject Casterline's argument that the district court erred in refusing to give his proposed instruction, which was identical to the district court's instruction except that it omitted the language "either alone or by aiding another." Because we found no error in the inclusion of this language in the district court's instruction, Casterline was not prejudiced by the district court's refusal to give his proposed instruction omitting this language.

## VI. CONCLUSION

For the reasons set forth above, we affirm the judgment of the district court.

AFFIRMED.

McCORMACK, J., not participating.

---

[29] § 28-206.

[30] See *State v. Brunzo*, 248 Neb. 176, 532 N.W.2d 296 (1995).