IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. CAMPBELL

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

DANIEL CAMPBELL, APPELLANT.

Filed November 22, 2016.    No. A-16-176.

Appeal from the District Court for Douglas County: J. MICHAEL COFFEY, Judge. Affirmed.

Matthew R. Kahler, of Finley & Kahler Law Firm, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and George R. Love for appellee.

INBODY and PIRTLE, Judges, and MCCORMACK, Retired Justice.

PIRTLE, Judge.

INTRODUCTION

Daniel Campbell appeals his convictions and sentences in the district court for Douglas County on seven charges that resulted from Campbell shooting at two Nebraska State Patrol Troopers as they were trying to initiate a traffic stop of the vehicle Campbell was in. He argues that the evidence was insufficient to support guilty verdicts on the charges against him and that his sentences are excessive. Based on the reasons that follow, we affirm.

BACKGROUND

On September 21, 2015, an Amended Information was filed charging Campbell with two counts of Attempted Assault on an Officer in the First Degree, one count of Discharging a Firearm While In or In Proximity of any Motor Vehicle at any Person or Occupied Motor Vehicle, three

counts of Use of a Deadly Weapon to Commit a Felony, and one count of Possession of a Deadly Weapon by a Prohibited Person.

A jury trial took place from November 2 to November 5, 2015. Nebraska State Patrol Trooper Steven Peck testified that he was working the night of February 4, 2015, with his partner Trooper Andrew Phillips. They were assigned to a section of Interstate 80. Peck described the weather conditions at the time as extremely cold with snow on the roads. Peck stated that Phillips was driving the patrol cruiser and made a decision to pull a vehicle over for a rear light violation. Peck testified that they activated the overhead lights on the cruiser and he observed the vehicle going back and forth from the shoulder of the road several times. He also testified that the vehicle signaled a right lane change indicating it was going to pull over onto the shoulder of the road, but did not do so.

Peck testified that while he and Phillips were pursuing the vehicle, he observed the front seat passenger look back at the troopers, and determined that the passenger appeared to be a white male with short hair wearing a dark-colored jacket. The vehicle exited the Interstate onto Center Street eastbound, and continued to the intersection of 108th Street, where the vehicle turned south. Peck testified that as he was reaching for the microphone in the cruiser to call in a pursuit, he heard a loud sound and looked up to see the passenger of the vehicle hanging out of the passenger side of the vehicle with a shotgun. The passenger fired a second shot, hitting the windshield of the cruiser and leaving a hole right in front of where Peck was sitting. After the two shots were fired, Phillips stopped the cruiser, at which time the troopers confirmed neither of them were injured and they relayed information to other officers. The troopers lost view of the suspect vehicle at that time. Peck testified that he was unable to get a specific facial description of the shooting suspect from either his direct observation or his review of the cruiser video.

Peck testified that he and Phillips began following the vehicle about 12:05 a.m. and followed the vehicle for three to five minutes before the shots were fired. He testified the call to other officers that shots had been fired was logged at 12:09 a.m. The type of shooting reported was a sawed-off shotgun.

Phillips confirmed that he was working alongside Peck on February 4 and into February 5, 2015, when they attempted to pull over a vehicle for a broken taillight. Phillips testified that during the pursuit of the vehicle, he turned on a spotlight to illuminate the vehicle. He could see a front passenger in the vehicle, who appeared to be male, and was looking back at the officers.

Phillips testified that suddenly he noticed the passenger reach out the window and fire shots at them. He observed the passenger to be either a white male or a light-skinned Hispanic male with short dark hair, as well as a dark jacket. He also saw that the gun was a sawed-off shotgun. Phillips heard two shots, and the second shot hit the windshield of the cruiser. After Phillips stopped the cruiser, he observed two holes in the windshield, a dent on the hood, and a broken spotlight.

Nebraska State Patrol Trooper Todd Steckelberg testified that he received a dispatch call shortly after midnight on February 5, 2015, indicating that shots had been fired at two officers. Steckelberg directed law enforcement agencies in the area to set up a perimeter in the area of the shooting. Steckelberg testified that he became aware of a subsequent call from Trooper Trinity Jones, who requested assistance in making a traffic stop on a vehicle matching the suspect vehicle,

and he responded. Jones testified that the initial dispatch call regarding the shooting came out at 12:05 a.m., and that he observed the suspect vehicle at 12:09 a.m.

When Steckelberg arrived on scene, Jones informed him that only one individual was observed in the vehicle. They took the female driver, Marissa McCormack, into custody and then confirmed there were no other occupants in the vehicle. Steckelberg testified that he established the location of the perimeter based on McCormack's statement that she dropped off a male passenger on a side street, and on his review of the video recording of the shooting from the cruiser's camera.

Steckelberg testified that around 1:40 a.m., Campbell was found hiding in a vehicle parked on a street. No weapon was recovered at that time.

Christian Sipherd testified that on the night of February 4, 2015, he was removing snow from the parking lot of a shopping area near 108th and Center in Omaha. He could see police cars with their lights flashing across the street from where he was, blocking the off ramp from the Interstate onto Center Street and on 108th Street and Center. He testified that he observed someone running through the parking lot heading north. The individual then disappeared from his sight. A few minutes later, he saw the same individual approaching his vehicle, waving a cell phone, trying to get Sipherd's attention. Sipherd testified that the situation "didn't feel right" so he left the area. He testified that the individual headed towards the south, into a residential neighborhood. Sipherd estimated that less than five minutes elapsed between the first and second time he saw the individual. Sipherd described the individual as a Latino male, wearing a black "hoody" or jacket. Sipherd was unable to identify Campbell at trial as the individual he observed that evening.

State Patrol Trooper Jason Prante testified that an individual who lived in the area where the officers were searching advised officers of footprints in the snow in his yard that did not exist when he went to bed. Prante and Trooper John Mobley began searching in the neighborhood where the footprints were found and they observed the same footprints in several different areas. Prante described the footprints as being made by a sneaker with a zig-zag or lightning strike pattern horizontal across the bottom of the shoe. Prante testified that there was no other foot traffic from civilians in the area being searched. The only other footprints were made by the boots of officers doing the search.

After following the footprints in the neighborhood, the prints ended at the street in front of a residence. Mobley suggested that they search the vehicles parked on the street. Upon doing so, Prante and Mobley discovered Campbell lying down in the backseat of a car.

After placing Campbell into custody, Prante and Mobley searched the vehicle where Campbell had been hiding. There were no weapons found during the search. Prante testified Campbell's shoes appeared to have the same print as the footprints he had been following. Prante also observed Campbell was wearing a dark-colored jacket. Mobley testified that Campbell matched the description of the subject being sought--a light-skinned Hispanic male with a dark coat--and his shoes appeared to match the footprints he had been following.

Stephen Vaccaro, who works for the Omaha Police Department Crime Lab, testified that he investigated the scene where the shooting took place and found two spent shotgun shells and a component to one of the shot shells. He also investigated the car where Campbell was found hiding,

where he located a cellphone and a small baggie of marijuana in the back of the car. The owner of the car testified that the cellphone and marijuana did not belong to him.

Vaccaro also investigated McCormack's vehicle, where he found a lawn chair bag, located on the floor of the front passenger side, and a backpack located on the back seat. The backpack contained numerous items, including the buttstock of a firearm, shotgun shells, and an ammunition belt. The backpack also contained personal items, such as an electric hair trimming kit, toothbrush, deodorant, dental floss, razors, and combs. A forensic scientist who works for the State Patrol testified that Campbell's DNA was found on the toothbrush and electric hair trimmer.

Vaccaro also testified that after searching the interior and exterior of McCormack's vehicle, only two latent fingerprints were identifiable and lifted from the vehicle. Neither of the fingerprints were Campbell's.

Charles Graeve, who lived in the neighborhood that was searched by officers in the early morning hours on February 5, 2015, testified that on April 4, 2015, he found a shotgun in his yard waste can. He explained that he had not done any yard work between February 5 and April 4, and on April 4 he picked up his yard waste can which was located by the side of his house so he could do some yardwork and he discovered the gun inside. After finding the shotgun, he called 911 and officers came to collect the evidence.

McCormack testified that she had only known Campbell for a couple weeks before the shooting incident. She and Campbell had smoked methamphetamine a couple of times together, including February 4, 2015. McCormack testified that prior to the shooting, she was using methamphetamine on a daily basis and using multiple times each day. McCormack testified that when she was using methamphetamine, she would not take her prescribed psychiatric medication, which caused her to be unstable.

Since February 5, 2015, McCormack has taken steps to change her life around. She testified that her medications are stable, she sees a psychiatrist, goes to therapy, is in chemical dependency group therapy, and a mental health day program.

McCormack testified that she saw Campbell with a shotgun the day before the shooting, and saw him point it at a man while they were at McCormack's friend's house. She stated that Campbell kept the shotgun in a long green bag, and that he also carried around a blue backpack.

She testified that during the day on February 4, 2015, she drove Campbell around to different locations and no one else was in the vehicle besides her and Campbell. At some point, they went to Campbell's friend's house. McCormack testified that Campbell had the long green bag and the backpack with him at that time. Campbell stayed at the friend's house into the evening, but McCormack left the house on two occasions. After McCormack returned the second time, Campbell asked her to take him someplace, but did not tell her where. The two of them left the friend's house, stopped at a gas station to fill up McCormack's vehicle, and then got on Interstate 80. There was video footage entered into evidence showing McCormack at the gas station with a male passenger in her car.

Shortly after getting on the Interstate, the officers turned on their overhead lights and wanted her to stop her vehicle. McCormack testified that she started to pull her vehicle over to the side of the road, but Campbell told her not to. She testified that she did not stop her vehicle because she was afraid given that Campbell had a gun and he instructed her not to stop. At the time,

Campbell was in the front passenger seat, and the lawn chair bag and backpack were between his legs.

McCormack testified that Campbell told her to exit the Interstate at Center Street, which she did, and then turned south onto 108th Street. At that point, Campbell opened the car door, sat on the door, and fired two shots at the officers with a shotgun. She believed the shotgun he used was the same weapon she observed Campbell with the day before.

McCormack testified that after Campbell fired the shots, he told her to make a right-hand turn into a residential neighborhood, which she did, and when they got part way down the street, Campbell jumped out of the car. The shotgun was not in the car after Campbell jumped out.

McCormack testified that she entered into a plea agreement with the State in regard to charges against her as a codefendant in this case. McCormack stated that the terms of her plea agreement required her to fully cooperate in the prosecution of Campbell and to testify truthfully against him.

Angela King testified that she was dating Campbell at the time of the events at issue and she recalled having a telephone conversation with Campbell on the night of February 4, 2015. She believed that Campbell was riding in a car during the conversation because it sounded windy. King stated that Campbell sounded normal, like everything was fine. During the conversation, Campbell told her to "hold on" and then the phone either "died" or lost the call. King testified that she did not hear gunshots during the call.

Sean Schmidt, an AT&T retail store manager, testified regarding phone records and confirmed that there appeared to be a phone call involving Campbell's phone from 11:59 p.m. on February 4, 2015 to 12:09 a.m. on February 5, 2015. King agreed that the first conversation between Campbell and herself took place between 11:59 a.m. on February 4, 2015 and 12:09 a.m. on February 5, 2015, as the telephone records indicated.

King testified that Campbell called her later that night, asking her to pick him up in West Omaha. She tried to call him back multiple times, but the calls went to voicemail.

McCormack testified that she did not know if Campbell used his cellphone during the time frame in question. She stated it was possible Campbell used his cellphone, but if he did, she did not see him using it.

Amy Weber, a forensic scientist with the State Patrol, testified that she examined several pieces of evidence in the case, including the shotgun, the two fired shot shells recovered from the scene, and the buttstock found in the backpack. She testified that based on her testing, the shot shells recovered from the scene were fired by the shotgun that was submitted for testing. She also testified that the buttstock was compatible for use with the shotgun.

After the State rested, Campbell made a motion to dismiss, which the trial court overruled. Campbell did not present evidence and the case was submitted to the jury. The jury found Campbell guilty on all counts.

The trial court sentenced Campbell to 25 to 25 years' imprisonment on each of the two counts of Attempted Assault on an Officer in the First Degree; 10 to 10 years' imprisonment on the count of Discharging a Firearm While In or In Proximity of any Motor Vehicle at any Person or Occupied Motor Vehicle; 10 to 10 years' imprisonment on each of the three counts of Use of a

Deadly Weapon to Commit a Felony; and 10 to 10 years' imprisonment on the count of Possession of Deadly Weapon by a Prohibited Person. The court ordered all sentences to run consecutively.

## ASSIGNMENTS OF ERROR

Campbell assigns that the trial court erred in (1) failing to find the evidence was insufficient to find him guilty of the charges in the amended information, and (2) imposing excessive sentences.

## STANDARD OF REVIEW

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Casterline*, 293 Neb. 41, 878 N.W.2d 38 (2016). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

We will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Bond*, 23 Neb. App. 916, 877 N.W.2d 254 (2016). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

## ANALYSIS

*Sufficiency of Evidence.*

Campbell first argues that the evidence was insufficient to find him guilty of the charges in the amended information. Campbell was charged with two counts of Attempted Assault on an Officer in the First Degree. An Assault on an officer in the First Degree is committed when a person intentionally or knowingly causes serious bodily injury to a peace officer, and the offense is committed while such officer is engaged in the performance of his official duties. Neb. Rev. Stat. § 28-929 (Cum. Supp. 2014). Pursuant to Neb. Rev. Stat. § 28-201(1) (Cum. Supp. 2014), a person is guilty of an attempt to commit a crime if he or she:

> (a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as he or she believes them to be; or
> (b) When causing a particular result is an element of the crime, a person shall be guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, he or she intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.

Campbell was also charged with one count of Discharging a Firearm While In or In Proximity of any Motor Vehicle at any Person or Occupied Motor Vehicle, pursuant to Neb. Rev. Stat. § 28-1212.04 (Cum. Supp. 2014). This crime is committed when "[a]ny person, within the

territorial boundaries of any city of the first class or county containing a city of the metropolitan class or primary class, who unlawfully, knowingly, and intentionally or recklessly discharges a firearm, while in any motor vehicle . . . at or in the general direction of any occupied motor vehicle . . . ."

Campbell was charged with three counts of Use of a Deadly Weapon to Commit a Felony, which occurs when any person uses a firearm to commit any felony which may be prosecuted in a court of this state. See Neb. Rev. Stat. § 28-1205 (Cum. Supp. 2014).

Finally, Campbell was charged with one count of Possession of Deadly Weapon by a Prohibited Person, an offense committed when a person possesses a firearm and has previously been convicted of a felony. See Neb. Rev. Stat. § 28-1206 (Cum. Supp. 2014). The parties stipulated that Campbell was a prior convicted felon.

Campbell contends that there were several areas where the evidence presented by the State was lacking or inconsistent. First, he argues that the evidence was inconsistent in regard to the timing of the shooting. He alleges that numerous witnesses gave inconsistent statements regarding the time the shooting took place, as well as the time when the initial dispatch call went out to other officers for assistance.

Second, Campbell points out that the shotgun allegedly used in the shooting was found two months after the incident and suggests that there was no evidence connecting him to this particular weapon. Third, he argues that law enforcement did not do a thorough investigation because there were several suspect or witness names brought up during the investigation based on items found in McCormack's vehicle and an identified fingerprint from the vehicle, and none of them were questioned.

Fourth, Campbell argues that McCormack's testimony, upon which the State heavily relied, was unreliable because she had given previous statements to the police, some of which were inconsistent with her trial testimony, and because she received a plea agreement in exchange for testifying against Campbell.

Campbell's arguments focus on inconsistencies in the evidence, evidence that could have been presented, and the credibility of witnesses. However, in reviewing a criminal conviction for a sufficiency of the evidence claim, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. See *State v. Casterline*, 293 Neb. 41, 878 N.W.2d 38 (2016). The question before us is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *id.*

The evidence showed that on the night of February 4, 2015, Campbell was a passenger in a vehicle driven by McCormack. Peck and Phillips initiated a traffic stop of McCormack's vehicle for a broken taillight. McCormack did not pull the vehicle to the side of the road and as the officers pursued the vehicle, Campbell fired two shots at the officers with a shotgun. Peck and Phillips testified that the shooter was a white or light-skinned Hispanic male with short hair and a dark-colored jacket. Peck and Phillips lost sight of McCormack's vehicle and McCormack dropped Campbell off on a residential street. About an hour and a half later, Campbell was found hiding in a vehicle parked on a residential street.

An investigation followed and a search of McCormack's vehicle revealed a lawn chair bag and a backpack. The backpack contained the buttstock of a firearm, shotgun shells and an ammunition belt. The backpack also contained personal items, including an electric hair trimmer and a toothbrush, both of which contained Campbell's DNA. McCormack testified that the day before the shooting she saw Campbell with a shotgun and that he kept it in a long green bag, and that he also carried a backpack with him.

Campbell testified that when the officers were in pursuit of her vehicle, she did not stop because she was afraid given that Campbell had a gun and instructed her not to stop. She stated that Campbell was in the front passenger seat and had the lawn chair bag and backpack between his legs. McCormack testified that during the pursuit, Campbell opened the car door and fired two shots at the officers with a shotgun. After the shots were fired, she turned into a residential neighborhood and Campbell jumped out of the car.

The evidence at trial also showed that in April 2015, a resident who lived in the neighborhood where Campbell was found hiding on February 5, discovered a shot gun in his yard waste can. Based on forensic testing, the shot shells recovered from the scene were fired by the shotgun recovered on April 5. The buttstock from the backpack was also compatible for use with the shotgun.

We conclude that when the evidence is viewed in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. Accordingly, there was sufficient evidence presented to the jury to support guilty verdicts on all charges. Campbell's first assignment of error is without merit.

*Excessive Sentences.*

Campbell next argues that the trial court imposed excessive sentences. We will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Bond*, 23 Neb. App. 916, 877 N.W.2d 254 (2016). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

The trial court sentenced Campbell to 25 to 25 years' imprisonment on each of the two counts of Attempted Assault on an Officer in the First Degree. This offense is a Class II felony, punishable by a maximum of 50 years' imprisonment and a minimum of 1 year's imprisonment. See § 28-929; § 28-201(4)(a); Neb. Rev. Stat. § 28-105 (Cum. Supp. 2014).

On the charge of Discharging a Firearm While in or in Proximity of Any Motor Vehicle at Any Person, Dwelling, Building, Structure, or Occupied Motor Vehicle, the trial court sentenced Campbell to 10 to 10 years' imprisonment. That charge is a Class IC felony, punishable by a maximum of 50 years' imprisonment and a mandatory minimum of 5 years' imprisonment. See § 28-1212.04; § 28-105. The three counts of Use of a Deadly Weapon to Commit a Felony are also Class IC felonies and the trial court sentenced Campbell to 10 to 10 years' imprisonment on each count. See § 28-1205(1)(a) and (c); § 28-105.

The trial court sentenced Campbell to 10 to 10 years' imprisonment on the Possession of Deadly Weapon by a Prohibited Person count. That charge is a Class ID felony, punishable by a

maximum of 50 years' imprisonment and a mandatory minimum of 3 years' imprisonment. See § 28-1206(1)(a) and (3)(b); § 28-105.

All of Campbell's sentences are within the statutory limits. We need only determine whether there was an abuse of discretion by the trial court in imposing the sentences it did.

When imposing a sentence, the sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the violence involved in the commission of the offense. *State v. Tyson*, 23 Neb. App. 640, 876 N.W.2d 13 (2016). The sentencing court is not limited to any mathematically applied set of factors. *Id.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.*

The trial court ordered a presentence investigation after Campbell was found guilty by the jury, but he did not fill out the offender information worksheet he was asked to complete and he refused to be interviewed. Campbell was 35 years old at the time of the presentence investigation, and has an extensive criminal history dating back to 1990, when he was juvenile. He was committed to the Youth Rehabilitative and Treatment Center twice as a juvenile. His criminal history as an adult dates back to 1995. The charges against him since that time have included multiple assaults, two of which involved peace officers. Other charges include possession of a gun by a felon, domestic abuse, and robbery. His most recent conviction was in 2014 and resulted in a two-year sentence.

We conclude that the trial court gave adequate consideration to the circumstances of this case and the appropriate sentencing factors before imposing the sentences. The sentences imposed are within the statutory limits, and the trial court did not abuse its discretion in the sentences it imposed. Campbell's second assignment of error is without merit.

CONCLUSION

We conclude that the evidence was sufficient to find Campbell guilty of the seven charges in the amended information, and that the trial court did not impose excessive sentences. Accordingly, the judgment of the district court is affirmed.

AFFIRMED.