Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/18/2019 01:10 AM CDT

In re Guardianship of K.R., a minor child.
Heather R., appellant, v. Mark R. and
Cynthia R., Guardians, appellees.

___ N.W.2d ___

Filed September 6, 2019.    No. S-17-846.

1. **Guardians and Conservators: Judgments: Appeal and Error.** Appeals of matters arising under the Nebraska Probate Code, Neb. Rev. Stat. §§ 30-2201 through 30-2902 (Reissue 2016 & Cum. Supp. 2018), are reviewed for error on the record. When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.

2. **Judgments: Appeal and Error.** An appellate court, in reviewing a judgment for errors appearing on the record, will not substitute its factual findings for those of the lower court where competent evidence supports those findings.

3. **Child Custody: Parent and Child: Presumptions.** The parental preference principle establishes a rebuttable presumption that the best interests of the child are served by placing custody of a minor child with his or her parent.

4. **Parent and Child: Words and Phrases.** Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being.

Petition for further review from the Court of Appeals, Pirtle, Riedmann, and Welch, Judges, on appeal thereto from the County Court for Douglas County, Marcela A. Keim, Judge. Judgment of Court of Appeals affirmed.

Julie A. Frank for appellant.

Patrick A. Campagna, of Campagna Law, P.C., L.L.O., for appellees.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Papik, J.

Years after her parents were appointed as coguardians for her daughter, K.R., Heather R. sought to terminate the guardianship or to obtain visitation with K.R. Following a trial, the county court declined to terminate the guardianship or to grant visitation. The Nebraska Court of Appeals affirmed, finding that it was in K.R.'s best interests for the guardianship to remain in place and for there to be no visitation. We granted Heather's petition for further review, in which she contended that the Court of Appeals erred by denying her motions without finding that she either was unfit or had forfeited her parental rights. Upon further review, however, we find that the county court determined that at the time of the trial, Heather was unfit to parent K.R. and that this finding was supported by competent evidence. Accordingly, we affirm, although based on different reasoning than that of the Court of Appeals.

## BACKGROUND

*Establishment of Guardianship for K.R.*

Heather is the biological mother of K.R., born in 2007. Appellees, Mark R. and Cynthia R., are Heather's parents and K.R.'s grandparents.

This case began in June 2014 when Mark and Cynthia filed a petition in Douglas County Court in which they asked the court to appoint them as coguardians for K.R. They also filed an ex parte motion, asking that their appointment as coguardians take effect immediately. After the court granted the motion for immediate appointment, Heather unsuccessfully sought to set it aside.

Heather later reached an agreement with Mark and Cynthia that they would be appointed as coguardians for K.R. The

agreement was adopted by the court in an October 29, 2014, order. The order required Heather to complete certain requirements: a psychological evaluation, a chemical dependency evaluation, and a parenting education course. The order also provided a specific parenting time schedule for Heather. The order further required that during her parenting time, Heather was not to leave K.R. without proper adult supervision and was to allow K.R. unrestricted access to a cell phone to call Mark and Cynthia or her guardian ad litem during her visits with Heather.

*Heather Is Convicted of Child Abuse.*

On March 17, 2015, Heather filed a motion to dismiss the guardianship. On May 4, just 2 days before the trial on Heather's motion to dismiss the guardianship was set to begin, K.R.'s guardian ad litem filed an ex parte motion to suspend visitation between Heather and K.R. because K.R. had disclosed to her therapist that she had been the victim of sexual abuse while in the care of Heather. The trial court entered an order the next day, suspending visits and canceling the trial on Heather's motion to dismiss the guardianship.

Heather was later charged with Class IIIA felony child abuse for failing to protect K.R. K.R. identified two minor boys as the perpetrators of abuse. The two boys and their family had lived in Heather's home. A trial was held on the criminal charge against Heather, and she was found guilty. She was sentenced on December 29, 2016, to 18 months' probation.

*Trial on Motions to Terminate Guardianship*
*and for Visitation.*

On April 3, 2017, Heather filed a motion to terminate the guardianship and a motion to reinstate visitation. Trial was held on both motions in May and June 2017. Because the evidence introduced at trial is central to the resolution of this appeal, we summarize it here.

Mark and Cynthia first called Cynthia to testify. Cynthia testified that she did not believe it would be appropriate for

K.R. to have contact with Heather. Cynthia testified that certain things seemed to "trigger [K.R.'s] memories of abuse." Cynthia testified that K.R. was terrified to go to Omaha, Nebraska, where Heather lives. She also testified that after the establishment of the guardianship, K.R. had issues with "wet[ting] her pants" at school and was fearful, had nightmares, sleepwalked, and sometimes woke up screaming.

Cynthia stated that K.R.'s symptoms had "ebb[ed] and flow[ed]" over time, but that her symptoms recently increased when she became aware of Heather's motion to dismiss the guardianship. Cynthia testified that K.R. saw a letter from the court in Mark and Cynthia's mail and that after seeing the letter, she started hurting herself. She would hit herself, pull her own hair, and squeeze her cheeks.

On cross-examination, Cynthia testified that she had not seen Heather for 3 years and did not know anything about her current fitness as a parent. She also admitted that Heather could not have expressed remorse or apologized directly to K.R., because there was a court order prohibiting contact between them.

Next to testify on behalf of Mark and Cynthia was Jeanne Cattau, K.R.'s therapist. Cattau testified that K.R. had been her patient since January 2015. Cattau testified that early on in her therapy, K.R. disclosed that she had been bitten and hit by others while in Heather's care. She testified that K.R. made more significant disclosures in May 2015. At that time, K.R. disclosed that two minor boys, who were residing in Heather's home, physically and sexually abused her on multiple occasions. K.R. identified "Seth" as the primary perpetrator but also made disclosures regarding his older brother.

Cattau testified that K.R. disclosed being bitten, hit, choked, and drowned. K.R. also told Cattau she had been locked in a bathroom; had been left home alone to care for her younger sister, who was 2 or 3 years of age at the time; had seen one of the boys choke her sister; and had also seen one of them sit

on her sister's chest, making it difficult for her to breathe. K.R. also reported "being forced to eat dog poop."

Cattau also testified that K.R. told her that she had told Heather about what Seth had done to her, but that when Seth gave a different account of what had occurred, Heather believed Seth and punished K.R. for sexual activity with Seth. Cattau also testified that K.R. reported that she was left in Seth's care even after her disclosure of abuse to Heather. Cattau testified that K.R. is still working through the resulting guilt and blame.

Cattau also acknowledged that K.R. had recently started to display additional emotional outbursts, such as hitting herself, out of concern for the current proceedings. Cattau testified K.R. had told her that there had been more abuse in addition to what she had already disclosed but that she was not ready to talk about it. K.R. told Cattau that she felt Heather did not love her and did not care about her, because Heather believed Seth instead of her.

Cattau testified that she was not in favor of visitation between Heather and K.R. at the time of trial. She testified to certain steps she would like to see taken before she would recommend visitation. Cattau also testified that she did not support termination of the guardianship.

On cross-examination, Cattau admitted that she had met Heather only one time, had never observed Heather and K.R. together, and had not conducted any therapy with or evaluation of Heather. She also testified that K.R. told her that Heather told K.R. not to talk about what happened with Seth, because it would "tear the family apart."

On redirect, Cattau testified that Heather's statements to K.R. not to talk about the abuse concerned her. She testified that this conduct would increase K.R.'s fears and contribute to a "sense of guilt." Cattau expressed concern that if Heather was successful in terminating the guardianship, it could lead to "re-victimization" of K.R. Cattau identified a lack of parental support as something that would contribute to continued

victimization of K.R. Cattau testified that this could lead to internalization of blame, depression, self-harming behaviors, self-harming comments, and other consequences.

Mark and Cynthia also called Heather to testify. She testified that she had been married since November 2014 and had lived with her husband since June 30, 2014. She also testified that she was employed at the time of trial.

Heather testified that she knew in May 2014 about K.R.'s being physically abused by Seth. She testified that when she learned about the abuse, she asked Seth's family to move out. She testified that the family instead had Seth move to live with an aunt, but that Seth had no additional contact with K.R. after he moved out.

Heather testified that she learned about the sexual abuse in June 2015, when a police officer called to ask her questions. Heather denied that K.R. ever told her about the sexual abuse or that she told K.R. not to talk about it. Heather testified that she thinks K.R.'s claim that Heather told her not to talk about the abuse was influenced by Mark and Cynthia.

Heather testified that while she did not agree with her conviction, she did acknowledge that "something horrible happened to [K.R.], and essentially it was [Heather's] fault" but that it was nothing she did intentionally. She also testified that she would "have to live with [failing to protect K.R.] for the rest of [her] life" and that she would "never forgive [her]self."

Heather testified that in 2014, she underwent a chemical dependency evaluation and a psychological and parental fitness evaluation and took a parenting class. In 2015, she started seeing a therapist and continued until December 2016. At that point, her therapist released her from therapy, and her probation officer said that he would not require additional therapy. In 2017, she took another psychological and parental fitness evaluation, another chemical dependency evaluation, and another parenting course. Heather testified that she had complied with or was working toward complying with every

provision of her probation. Heather testified that there was a no-contact order between K.R. and her and that she had not attempted to contact K.R. since it was entered. Heather denied ever telling K.R. that she should not talk about the abuse.

At the close of Mark and Cynthia's case, Heather moved for a directed verdict, which the court denied. Heather then presented her evidence, beginning with her own testimony.

Heather reiterated that she had taken the steps required by the initial guardianship order. She testified that after a psychological parenting evaluation and chemical dependency evaluation, it was recommended that she see a therapist to address low self-esteem issues. She testified that she had completed therapy and was discharged successfully. She testified that she also completed a parenting class, as required by the order establishing the guardianship, and had additionally obtained a second psychological and parental fitness evaluation and taken another parenting class focusing on parenting children who have gone through trauma.

Heather testified that she recalled occasions during which K.R. was talking about Seth and that she told K.R. that she did not need to worry about him anymore, because he was no longer capable of hurting her. Heather testified that K.R. may have misunderstood these statements as telling her not to talk about the abuse.

Heather was also asked whether she would be willing to wait to have contact with K.R. until Cattau believed K.R. was ready. Heather testified that she would not, because she believed that Cattau obtained information only from Mark and Cynthia and was biased against her.

Heather also called Dr. Stephanie Peterson, a clinical psychologist, to testify on her behalf. She provided testimony regarding psychological evaluations and parenting assessments she performed on Heather. Peterson testified that based on her evaluations and assessments, Heather "had all the qualities of an adequate parent" and that she had matured in positive ways between her first assessment of Heather in November 2014 and

a subsequent assessment in March 2017. Peterson also noted that K.R.'s younger sister lives with Heather and that Peterson was not aware of any issues or problems with Heather's parenting of that child. She testified that if a parent is competently parenting one child, it indicates that the parent should be able to competently parent another child.

*County Court Order on Motion
to Terminate Guardianship.*

Following trial, the county court entered an order denying Heather's motion to terminate the guardianship. In the order, the county court stated that it would apply the parental preference principle. It explained that under the principle, Mark and Cynthia were required to establish by clear and convincing evidence that Heather is unfit or has forfeited her right to custody and that absent such a showing, reunification with Heather was required by law.

The trial court then praised many of Heather's actions after the establishment of the guardianship as "commendable." But it also noted that Heather had failed to take responsibility for what happened to K.R. It also stated that Heather "seeks reunification because that is what she wants; not because it is in the best interest of [K.R.]." The county court denied Heather's motions.

Heather appealed the county court's decision.

*Court of Appeals.*

On appeal, Heather argued that the county court erred by declining to terminate the guardianship or order any visitation. She also argued that the county court improperly delegated to Cattau the authority to make decisions regarding visitation and termination of the guardianship.

The Court of Appeals affirmed. In its opinion, the Court of Appeals stated that "there are two competing principles in the area of child custody jurisprudence: the parental preference principle and the best interests of the child principle." *In re Guardianship of K.R.*, 26 Neb. App. 713, 722, 923 N.W.2d

435, 443 (2018). With respect to the parental preference principle, the Court of Appeals noted that this court has previously said that to deny a parent the custody of his or her minor child, "it must be affirmatively shown that such parent is unfit to perform parental duties or that he or she has forfeited that right." *Id.* at 723, 923 N.W.2d at 443. But the Court of Appeals also pointed to the following language in our opinion in *Windham v. Griffin*, 295 Neb. 279, 887 N.W.2d 710 (2016):

> "We continue to adhere to the view that the parental preference doctrine, by definition, is a preference, and it will be applied to a child custody determination unless it is shown that the lawful parent is unfit or has forfeited his or her superior right or the preference is negated by a demonstration that the best interests of the child lie elsewhere."

*In re Guardianship of K.R.*, 26 Neb. App. at 724, 923 N.W.2d at 443.

The Court of Appeals relied on this language to hold that there are rare cases in which the parental preference principle can be rebutted by a showing that the child's best interests will be served by custody being awarded to a nonparent rather than a parent. Based on the evidence in the record, particularly Cattau's testimony about how K.R. was still dealing with the abuse, the Court of Appeals found that this was such a case. The Court of Appeals also found that the county court did not err in not ordering visitation and did not improperly delegate to Cattau decisions regarding termination of the guardianship and visitation.

We granted Heather's petition for further review.

## ASSIGNMENTS OF ERROR

Heather's primary contention on further review is that the Court of Appeals erred by affirming the county court's denial of Heather's motions to terminate the guardianship and for visitation on the grounds that the relief Heather sought would be contrary to K.R.'s best interests.

She also claims that the Court of Appeals erred when it found that the county court did not improperly delegate to Cattau decisions regarding termination of the guardianship and visitation. We find no error in the Court of Appeals' disposition of this issue, and we see no need to comment on it further. Accordingly, our analysis below is limited to whether the Court of Appeals erred by affirming the county court's order denying Heather's motions to terminate the guardianship and for visitation.

### STANDARD OF REVIEW

[1,2] Appeals of matters arising under the Nebraska Probate Code, Neb. Rev. Stat. §§ 30-2201 through 30-2902 (Reissue 2016 & Cum. Supp. 2018), are reviewed for error on the record. See *In re Guardianship of D.J.*, 268 Neb. 239, 682 N.W.2d 238 (2004). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.* An appellate court, in reviewing a judgment for errors appearing on the record, will not substitute its factual findings for those of the lower court where competent evidence supports those findings. *McManus Enters. v. Nebraska Liquor Control Comm.*, 303 Neb. 56, 926 N.W.2d 660 (2019).

### ANALYSIS

[3] All the parties to this case and every court to have considered it agree that because Heather is K.R.'s parent, this case is governed by what this court has dubbed the "parental preference principle." See, e.g., *In re Guardianship of D.J., supra*. That principle establishes a rebuttable presumption that the best interests of the child are served by placing custody of a minor child with his or her parent. See *id.*

Heather's objection to the Court of Appeals' decision is not that it applied the parental preference principle. Instead, she contends that the Court of Appeals erred by finding that the parental preference principle was rebutted by a demonstration

that K.R's best interests would be served by keeping the guardianship in place and not allowing visitation. Heather argues that allowing the parental preference principle to be rebutted by a best interests showing dilutes the doctrine and violates her right to due process under the 14th Amendment to the U.S. Constitution. She argues that under this court's precedent as well as cases of the U.S. Supreme Court interpreting the 14th Amendment, the parental preference principle can be overcome only if the nonparent who seeks custody proves by clear and convincing evidence that the parent is either unfit or has forfeited his or her right to custody.

Heather correctly points out that on many occasions, this court has said that under the parental preference principle, absent proof that a parent is unfit or has forfeited the right to custody, a parent may not be deprived of the custody of a minor child. See, e.g., *In re Interest of Lakota Z. & Jacob H.*, 282 Neb. 584, 804 N.W.2d 174 (2011); *Farnsworth v. Farnsworth*, 276 Neb. 653, 756 N.W.2d 522 (2008); *In re Interest of Xavier H.*, 274 Neb. 331, 740 N.W.2d 13 (2007); *In re Guardianship of D.J., supra*; *Gomez v. Savage*, 254 Neb. 836, 580 N.W.2d 523 (1998). She asks that to the extent our opinion in *Windham v. Griffin*, 295 Neb. 279, 887 N.W.2d 710 (2016), held that the presumption can be overcome by anything other than a showing of unfitness or forfeiture, we overrule it.

Before reaching these arguments, however, we note that while the Court of Appeals clearly found the parental preference principle was negated by a best interests demonstration, it is not so clear that the county court did the same. In fact, before proceeding to analyze the issues raised by Heather's motions, the county court articulated the parental preference principle precisely, as Heather contends the law requires. It stated:

> The parental preference principle applies in guardianship proceedings that affect child custody and creates a rebuttable presumption that the best interests of the child are served by reuniting the minor child with his or her

> biological parent. The current guardians must establish by clear and convincing evidence that the biological parent is unfit and/or has forfeited her right to custody. Absent such a showing, the law requires reunification.

The county court went on to discuss evidence introduced at trial that would bear on Heather's fitness as a parent before ultimately denying Heather's motions.

In our view, the county court decision is best read as making an implicit determination that Heather was not fit to have custody of or visitation with K.R. The county court said that absent a showing of unfitness or forfeiture, "the law requires reunification," and after discussing facts pertaining to Heather's fitness, it denied reunification. The county court's order does also contain some language referring to K.R.'s "best interests," but we do not think the order can logically be read as turning on a best interests determination when the order states that a finding of unfitness or forfeiture was the only basis upon which Heather could be denied reunification with K.R.

Because we understand the county court to have denied Heather's motions on the ground that she was unfit to parent K.R., we begin our analysis by reviewing that determination.

*Did County Court Err by*
*Finding Heather Unfit?*

[4] We have defined parental unfitness as "a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being." *Farnsworth*, 276 Neb. at 657, 756 N.W.2d at 526. Mark and Cynthia primarily argue that Heather's unfitness was demonstrated by the conduct that led to her child abuse conviction. We begin our consideration of whether there was competent evidence to support a finding of unfitness with that evidence.

Many witnesses testified to the facts that led to Heather's conviction. This testimony indicated that Heather left K.R. and her younger sister alone for long periods of time with minor

boys who were members of a family temporarily staying at Heather's home. During that time, K.R. was abused by the minor boys. There was evidence that this abuse was of both a physical and sexual nature. K.R. reported to Cattau that the physical abuse included biting, hitting, choking, and drowning, as well as locking K.R. in a bathroom and forcing her to eat dog feces. Heather does not dispute that K.R. was subjected to physical and sexual abuse and that her child abuse conviction was based on the theory that Heather failed to protect her from that abuse.

This evidence unquestionably reflects poorly on Heather's parenting, but we must also consider when the conduct occurred. There is some dispute between the parties as to when Heather failed to protect K.R. from abuse. Heather contends the abuse predated the establishment of the guardianship in June 2014. Mark and Cynthia, pointing only to the charging documents in the criminal case, contend that the abuse continued through May 2015. In either case, however, Heather's failure to protect K.R. from abuse concluded *over 2 years prior* to the trial on Heather's motions to terminate the guardianship and for visitation.

The passage of time following the facts forming the basis of Heather's conviction affects the weight those facts can be given in an unfitness analysis. In *In re Interest of Lakota Z. & Jacob H.*, 282 Neb. 584, 804 N.W.2d 174 (2011), we stated that evidence of unfitness must be focused upon a parent's *present* ability to care for a child. We added that evidence of a parent's past misdeeds may be pertinent, "insofar as [they] suggest[] present or future faults" and that "in some instances, [they] may be *very* pertinent." *Id.* at 594, 804 N.W.2d at 182 (emphasis in original).

We do not view Heather's failure to protect K.R. from abuse as entirely irrelevant to the fitness analysis. At the same time, however, we question whether this evidence from at least 2 years in the past would, standing on its own, support a determination that Heather was unfit at the time of trial. That,

however, is a question we need not confront, because there was other evidence in the record pertaining to Heather's fitness. We will discuss that evidence now.

While the basic facts underlying Heather's child abuse conviction are not disputed, the evidence introduced at trial relating to Heather's fitness as a parent conflicted on many other points. Cattau testified that K.R. disclosed to her that when K.R. told Heather about the physical and sexual abuse, Heather not only did not believe K.R., she blamed and punished K.R. for engaging in sexual conduct and told K.R. not to talk about it. At trial, Heather denied that K.R. informed her of the sexual abuse or that she blamed K.R. for it. Heather also testified that K.R.'s statements that Heather told her not to talk about the abuse were the result of Mark and Cynthia's influence on K.R.

Testimony from Cattau also indicated that K.R. was left with Seth after telling Heather about the abuse. Heather denied this as well, contending that Seth left her home after she demanded that his family leave.

There was also conflict in the testimony as to whether Heather could effectively meet K.R.'s needs. Peterson testified that based on her evaluations of Heather, there was no reason to believe she would be an abusive or unfit parent. Cattau, however, opposed termination of the guardianship or visitation and outlined many concerns regarding contact between Heather and K.R. In particular, Cattau expressed concerns about the harm K.R. suffered as a result of Heather's telling K.R. not to talk about the abuse. Cattau testified to K.R.'s need for "parental support" and the negative consequences that were likely to follow in the absence of such support. While Heather testified to her belief that Cattau was biased and that the only information she received was through Mark and Cynthia, Cattau testified to steps she took to ensure that K.R. independently disclosed information to her.

As the foregoing discussion illustrates, two very different accounts of Heather's fitness as a parent were presented at

trial. If Heather's side of the story were believed, one would find that after being informed that K.R. was being physically abused, Heather supported K.R., promptly took steps to remove the abuser, recognized some of her faults as a parent, took steps to address those deficiencies, and then at trial accepted responsibility for her initial failure to protect K.R. Under this view, Heather resisted Cattau's opinion that contact with Heather would be detrimental to K.R. only because Cattau is a biased therapist who accepts everything Mark and Cynthia tell her.

Other evidence, however, portrayed a different story. There was evidence that K.R. told Heather she was being physically and sexually abused and that Heather responded by not only blaming K.R. for engaging in sexual activities but also telling her not to talk about the subject and allowing the principal perpetrator of the abuse to remain in her home. Heather denied all of this at trial and even went so far as to assert that K.R. said she told Heather about the abuse only because Mark and Cynthia influenced her to do so.

While we are presented with conflicting evidence, our standard of review in this matter does not allow us to reweigh this evidence or make our own factual findings. Rather, our task is limited to determining whether there is competent evidence to support a finding of unfitness by clear and convincing evidence. As we will explain, we find there is competent evidence to support such a finding.

As we have described above, evidence was introduced at trial showing that K.R. informed Heather of the physical and sexual abuse and that Heather disregarded K.R.'s complaints, blamed her for the abuse, told her not to talk about it, and allowed the perpetrator of the abuse to remain in her home. Heather failed to accept responsibility for these actions and, instead, denied them at trial and suggested that a portion of K.R.'s account was not based in fact. We also note that at trial, while Heather purported to accept responsibility for at least allowing some abuse of K.R., she described her particular

failure as "trying to help some people out" and "allow[ing] them into [her] home" and "because of that, [her] daughter was hurt." This description seems to minimize Heather's culpability for actions that ultimately resulted in a felony child abuse conviction for knowingly and intentionally placing K.R. in an abusive situation.

Many courts have recognized that the failure to accept responsibility for past misconduct can indicate present unfitness. See, e.g., *K.D. v. People*, 139 P.3d 695 (Colo. 2006); *In re C.N.*, 196 Ill. 2d 181, 752 N.E.2d 1030, 256 Ill. Dec. 788 (2001); *In re Emma S.*, 177 A.3d 632 (Me. 2018); *In re Kelly S.*, 715 A.2d 1283 (R.I. 1998). We believe that is the case here. In fact, we find that Heather's failure to accept responsibility is particularly relevant to the fitness determination, given testimony regarding K.R.'s emotional needs.

Cattau testified that K.R. was emotionally harmed as a result of Heather's telling her not to talk about the abuse and was dealing with a sense of guilt for "believing that she is responsible for tearing her family apart." Cattau testified that a lack of parental support would contribute to "continued victimization" and outlined various negative consequences thereof. Cattau's testimony suggests that given the abuse she suffered and her emotional state, K.R. is in particular need of support and validation from those who care for her.

Courts in other jurisdictions have recognized that when a child develops special needs as a result of past misconduct by a parent, a parent's inability to meet those needs bears on parental fitness. For example, in *Matter of Welfare of M.A.*, 408 N.W.2d 227 (Minn. App. 1987), a Minnesota appellate court affirmed a finding of unfitness based in part on the parent's inability to meet the emotional needs of a child arising as a result of past physical abuse committed by the parent. Similarly, in *Matter of K.M.M.*, 186 Wash. 2d 466, 379 P.3d 75 (2016), the Washington Supreme Court affirmed a trial court's finding that a father was unfit based on the determination that the father, who had not had substantial contact with his child

after the child was removed from the home due to neglect, was unable to parent the child because of a lack of attachment. The court emphasized that "in order to determine whether a parent is a fit parent *to a particular child*, the court must determine that the parent is able to meet that child's basic needs." *Id.* at 494, 379 P.3d 90 (emphasis in original). See, also, *In re Scott S.*, 775 A.2d 1144, 1151 n.14 (Me. 2001) ("[t]his does not mean that the facts relating to the children's needs should not be considered in determining the parents' capacity to care for them. To the contrary, the parents' actions and abilities must be understood and judged in the context of the health, ages, and needs of the children").

We find these cases instructive because there is competent evidence here that K.R. has needs arising from Heather's past misconduct and that Heather, at the time of the trial, was unable to meet those needs. As noted above, Cattau's testimony suggests that K.R.'s needs include support and validation from parental figures. At trial, however, Heather continued to deny K.R.'s account and to blame Mark and Cynthia for influencing K.R. to fabricate details. Put in terms of our unfitness standard, there was competent evidence that Heather has a deficiency or incapacity that will probably prevent her from performing reasonable obligations to K.R., which will probably result in detriment to K.R.'s well-being. See *Farnsworth v. Farnsworth*, 276 Neb. 653, 756 N.W.2d 522 (2008).

Heather's inability to meet K.R.'s unique needs also distinguishes this case from *In re Interest of Xavier H.*, 274 Neb. 331, 740 N.W.2d 13 (2007). In that case, the State sought termination of a mother's parental rights as to one of her three children. We held that the evidence was insufficient to establish that termination was in the child's best interests. We pointed out that the State had admitted that the mother was an adequate parent to her other two children, but had failed to show any reason why the mother would not be an adequate parent to the third child as well. In this case, while there is evidence that Heather has custody of K.R.'s younger sister and

no evidence that she is unfit to parent that child, the evidence described above supports a finding that Heather is not fit to parent K.R.

For these reasons, we find that there was competent evidence supporting the county court's finding that Heather was unfit at the time of trial. Because guardianships are temporary and depend upon the circumstances existing at the time, our findings would not foreclose Heather from seeking visitation or termination of the guardianship in the future. See *In re Guardianship of Zyla*, 251 Neb. 163, 555 N.W.2d 768 (1996).

*Role of Best Interests in Parental*
*Preference Principle Analysis.*

Because we find that there was competent evidence to support the county court's finding that Heather was unfit to parent K.R., there is no reason for us to consider Heather's argument that the Court of Appeals erred by finding that the parental preference principle was rebutted by a showing that it was in K.R.'s best interests for the guardianship to remain in place. For the same reason, there is no need to consider Heather's request that we overrule *Windham v. Griffin*, 295 Neb. 279, 887 N.W.2d 710 (2016), to the extent it holds that the parental preference principle can be negated by a showing that it is in the child's best interests for a nonparent to have custody rather than a parent. We do, however, take this opportunity to make some observations regarding the interaction of the parental preference principle and the best interests of the child standard.

With a citation to *Windham*, the Court of Appeals found that this is "one of those rare cases where the best interests of the child defeats the parental preference principle." *In re Guardianship of K.R.*, 26 Neb. App. 713, 724, 923 N.W.2d 435, 444 (2018). The Court of Appeals noted various pieces of evidence it considered relevant to its best interests analysis, but it did not otherwise explain why it believed this was such a case. We note that the Court of Appeals followed a similar

approach in a case issued shortly after its opinion in this case. See *State on behalf of Lilliana L. v. Hugo C.*, 26 Neb. App. 923, 924 N.W.2d 743 (2019). While it is not necessary for us to determine whether the Court of Appeals erred in these cases, we believe caution is warranted in this area for reasons we will briefly explain.

First, *Windham* cannot be read to stand for the proposition that the parental preference principle will be rebutted in every case in which the nonparent might prevail in a pure best interests comparison. In *Windham*, we rejected the nonparent's invitation to "examine the merits as though [the parent and nonparent] were standing on equal footing and the outcome would be determined only by reference to best interests." 295 Neb. at 290, 887 N.W.2d at 718. Instead, we emphasized that the parental preference principle could *not* be rebutted by a showing that the nonparent can "provide more amenities and a better life" or "'"'merely because on financial or other grounds a stranger might better provide.'"'" *Id.* at 291, 292, 887 N.W.2d at 719.

Second, while *Windham* makes clear that there will be cases in which a best interests showing will be insufficient to overcome the parental preference principle, we did not have the occasion in *Windham* to explore the circumstances in which a best interests showing *could* negate the presumption. Our opinion in *Windham* did cite a case from a Florida intermediate appellate court in which the court affirmed a trial court's award of custody to an ex-stepmother rather than the child's natural father based on the child's best interests rather than a finding of unfitness, but we did so only in the course of noting that it was distinguishable from the facts before us. We also note that courts in other states have not taken a uniform approach to the question of when, if ever, a court may deny a parent custody of a child based on a determination that the child's best interests lie elsewhere. See, e.g., *Watkins v. Nelson*, 163 N.J. 235, 748 A.2d 558 (2000) (collecting cases).

For reasons we have noted, this case does not present the opportunity to exhaustively explore the interplay of the best interests standard and the parental preference principle. We urge courts, however, to be mindful of the above considerations when confronted with an argument that custody of a child should be awarded to a nonparent rather than a parent because doing so would be in the best interests of the child.

## CONCLUSION

Because we find that the county court's determination that Heather was unfit to parent K.R. was supported by competent evidence, we affirm the decision of the Court of Appeals, albeit on different grounds.

Affirmed.