IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE GUARDIANSHIP OF KAYN M.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE GUARDIANSHIP OF KAYN M., A CHILD UNDER 18 YEARS OF AGE.

CECELIA G., APPELLANT,

V.

ANNETTA M., APPELLEE.


Filed December 5, 2023.    No. A-23-128.


Appeal from the County Court for Boyd County: KALE B. BURDICK, Judge. Affirmed.

Nicholas R. Glasz for appellant.

Ashley D. Boettcher, of Galyen Boettcher Baier P.C., L.L.O., for appellee.


PIRTLE, Chief Judge, and MOORE and ARTERBURN, Judges.

PIRTLE, Chief Judge.

## I. INTRODUCTION

Annetta M. filed a petition for guardianship of her grandson, Kayn M., following the death of her son, Derek M. Kayn's mother, Cecelia G., opposed the appointment and sought custody of Kayn. Following a trial, the county court for Boyd County found Cecelia to be presently unfit to perform parental duties and granted Annetta's petition for guardianship. Cecelia now appeals, and for the reasons set forth herein, we affirm.

## II. BACKGROUND

Kayn was born in 2016. Following his birth, Derek and Cecelia lived in California together off and on until 2019. After they stopped living together, Kayn primarily lived with Cecelia, but would often stay with Derek. In February 2020, Derek and Kayn traveled to Nebraska to visit Derek's mother and father. Although they did not plan to stay in Nebraska, the COVID-19

pandemic impacted their ability to return to California. In the aftermath of the pandemic, Derek and Cecelia agreed that it was in Kayn's best interest to attend school in Nebraska because California schools had not yet reopened. While in Nebraska, Annetta cared for Kayn when Derek worked. On November 9, 2022, Derek was killed in a car accident. On November 21, Annetta filed this action to establish guardianship of Kayn, which Cecelia opposed.

1. County Court Trial and Order

Following a trial, the county court found that Cecelia was presently unfit to perform parental duties and granted Annetta's petition for guardianship. In finding that Cecelia was unfit, the county court cited to several "concerning factors" that taken together supported a finding of parental unfitness. Overall, the court generally stated that Cecelia lacked the maturity and parental relationship with Kayn necessary to properly care for him.

(a) Cecelia's Lifestyle

Cecelia was 29 years old at the time of trial and has another son and daughter with different men. Kayn is her middle child. While she has custody of her daughter, she has not seen her other son since Valentine's Day 2020. She stated that her other son was living with her for a while, but after she was arrested for domestic violence, he was removed from her care. There were then custody disputes between her and her son's father that involved him calling Child Protective Services (CPS) multiple times. Eventually, she gave up custody of this other son because CPS was coming to her home too frequently. He currently lives with his father and Cecelia does not provide any financial support to them.

Cecelia now lives in California with her unemployed boyfriend, Kato, and their 2-year-old daughter. As Kato is unemployed, Cecelia is the household's sole provider. She supports the family by working three days a week at a "strip club" as an "exotic dancer" where she earns $39,000 a year. She also receives state aid. She has worked as an exotic dancer for five years. While Cecelia expressed a desire to take courses to become a paralegal, she had not taken any steps to pursue that goal. In 2021, Cecelia underwent a $5,600 breast augmentation. While she refused to identify who paid for the surgery, she indicated that one of her "customers" at the strip club financed the procedure.

Due to the nature of her work, Cecelia is away from home anywhere from 4 p.m. until 1 a.m. to 4 a.m. While Cecelia works at night, Kato is entrusted with the care of her children. Kato was 22 years old at the time of trial and has known Cecelia since 2019. Kato smokes marijuana every night. However, Cecelia claimed he does not smoke when caring for the children and that he would wait until 2 a.m. to 4 a.m. for her to get home to start smoking.

At trial, several images from Kato's social media were brought forward. Some of these posts showed him actively smoking marijuana while others referenced how much marijuana he smokes. There were also numerous photos of him possessing large amounts of money. When asked how he obtained this money while being unemployed, Cecelia claimed it was fake production money. In addition to those posts, Kato's social media also contained a photo depicting Promethazine Codeine syrup alongside a Sprite bottle. When combined, these ingredients make a recreational drug known as "lean."

Images taken from Cecelia's social media were also received into evidence as exhibit 3. These images included a picture of a speedometer gauged at 115 miles per hour. While Cecelia claimed that she was not driving, she admitted that she took the picture while in the car with a friend. Another post on her social media shows two pictures of her and Kato with the following caption: "A year ago today I met My love! Drunk as fuck after I jumped on stage while Dru Down was on rappin on stage lmaooo! And now we're having our first baby girl together. . . ."

### (b) Cecelia's Relationship With Kayn

Before Kayn moved to Nebraska in February 2020, Cecelia played an active role in his life. Although he often stayed with Derek, he primarily lived with Cecelia. However, once Kayn left California, Cecelia's contact with him decreased. In March 2021, Derek obtained a decree of paternity in the Boyd County District Court, and was awarded full custody of Kayn and a parenting plan was put into place. Pursuant to that plan, Cecelia was entitled to parenting time over the Christmas, fall and spring break, as well as for 8 weeks in the summer. Although she was entitled to time over the fall and spring breaks, the plan required Kayn to remain in Nebraska during those periods. In consideration of not having to pay any child support, the plan required Cecelia to pay for any travel-related expenses.

In accordance with the plan, Kayn spent 6 weeks in California with Cecelia in 2021 and 8 weeks there in 2022. On both occasions, Annetta transported Kayn to California and for the 2021 visit, she brought him back to Nebraska. Although the parenting plan anticipated Cecelia to cover all transportation expenses in lieu of paying child support, her only contribution was a one-time $400 payment to Annetta.

Outside of the two summers Kayn spent with her, Cecelia did not see her son. During the 3 years he spent in Nebraska, she never visited. The only time she came to Nebraska was after Derek's death to gain custody. Further, while Kayn was in Nebraska, she maintained minimal contact with him. While she claimed to call or FaceTime him once or twice a week, Annetta stated 1 or 2 months would go by between calls. When those long periods without communication occurred, Annetta would initiate calls to Cecelia so Kayn could have contact with his mother. Cecelia also never made any efforts to reach out to Kayn's school or teachers to see how he was doing. Additionally, although Kayn's school offers an option for virtual parent teacher conferences, Cecelia never took advantage of that opportunity.

According to Annetta, in the 3 years Kayn lived in Nebraska, he never asked for his mother. This lack of attachment not only worried Annetta, but it also concerned Jackie Meyer, a mental health practitioner Kayn saw after Derek's death. When asked to draw pictures of himself at his grandparent's home during a session with Meyer, Kayn drew pictures of himself, Annetta, and his grandfather. When asked to do the same activity, but in reference to Cecelia's home, Kayn's behavior changed, and he became a "[t]otally different little boy." "He crawled onto the couch where [Annetta] was sitting and he just couldn't . . . he was so dysregulated." After more struggle and prompting, he eventually drew the image. However, beyond the change in his behavior, Meyer was very concerned that the image of his mother was "just like a blob." She indicated that the absence of any features indicated a lack of connection.

More so, Annetta also provided testimony claiming that Kayn told her that he did not want to go back to California. Kayn informed her that he did not want to return because Kato was mean

and yells at him when he tries to wake up Cecelia. Kayn also told Annetta that he was "number three." Upon being asked for clarification, Kayn informed her that Kato told him that Kayn's sister is first, Kato is second, and Kayn is third in the order of priority.

## 2. COUNTY COURT'S ORDER

The county court relied on multiple factors in finding Cecelia currently unfit to perform parental duties. The court stated that while none of the factors standing alone would warrant a finding of unfitness, their totality demonstrates clear and convincing evidence that "[Cecelia] puts herself before Kayn" and "does what she wants to do[,] not what is in the best interests of her children."

The court first pointed to the fact that Cecelia has three children from three different men. Of those three children, only one resides with her and she does not provide any support to the other two. The court then took particular concern with Cecelia's comfort in entrusting Kato with the care of her children. It indicated that although marijuana is legal in California, someone who is under its influence daily should not be solely responsible for young children. The court also took issue with the online images of Kato holding large sums of money without any indication as to how he obtained it. While Cecelia claimed the bills were fake prop money, the Court found that testimony not to be credible.

The court also highlighted Cecelia's relative absence from Kayn's life for the preceding 3 years. Beyond her only exercising her parenting time during the summers, her other interactions with Kayn were infrequent and inconsistent. Sometimes weeks went by between phone calls. More so, she failed to show any interest in reaching out to Kayn's teachers or in attending any of his activities.

The court then directed attention to Cecelia's risk-taking behaviors. This includes allowing someone she met at her strip club to pay for her $5,600 breast augmentation which the court cited as abnormal and not a "transaction among friends." Other risky behavior included being in a vehicle that was traveling at 115 miles per hour and being heavily intoxicated at a concert where she met Kato. The court noted that Cecelia and Kato "act more like children than parents." Additionally, the court specified that it had little faith in Cecelia following through on her goal of becoming a paralegal. The court cited to the fact that she already has custody of her 2-year-old child and has not taken any steps toward changing her career.

The court went on to state that appointing Annetta as Kayn's guardian was in his best interest. Kayn displayed a special attachment to Annetta and indicated that he felt safe with her. More so, while living with Annetta he was doing well in school and became integrated into the community. Therefore, the court concluded it was in Kayn's best interest to stay with Annetta but continue to develop and foster a relationship with Cecelia.

## III. ASSIGNMENTS OF ERROR

Restated and reordered, Cecelia assigns that the county court erred in (1) receiving exhibit 3 into evidence over her objections for lack of foundation and authentication; (2) failing to abscond from judicial bias or prejudice in its decision making; and (3) determining she was unfit to perform parental duties.

## IV. STANDARD OF REVIEW

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *Richards v. McClure*, 290 Neb. 124, 858 N.W.2d 841 (2015). Because authentication rulings are necessarily fact specific, a trial court has discretion to determine whether evidence has been properly authenticated, and an appellate court reviews a trial court's ruling on authentication for an abuse of discretion. *State v. Pullens*, 281 Neb. 828, 800 N.W.2d 202 (2011).

Failure to make a timely objection waives the right to assert prejudicial error on appeal. *Ecker v. E & A Consulting Group*, 302 Neb. 578, 924 N.W.2d 671 (2019). When an issue is raised for the first time in an appellate court, it will be disregarded inasmuch as a lower court cannot commit error in resolving an issue never presented and submitted to it for disposition. *Id.*

When evaluating a trial judge's alleged bias, the question is whether a reasonable person who knew the circumstances of the case would question the judge's impartiality under an objective standard of reasonableness, even though no actual bias or prejudice was shown. *State v. Ezell*, 314 Neb. 825, 993 N.W.2d 449 (2023). Appeals of matters arising under the Nebraska Probate Code are reviewed for error on the record. *In re Guardianship of K.R.*, 26 Neb. App. 713, 923 N.W.2d 435 (2018). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.* An appellate court, in reviewing a judgment for errors appearing on the record, will not substitute its factual findings for those of the lower court where competent evidence supports those findings. *Id.*

## V. ANALYSIS

### 1. RECEIPT OF EXHIBIT 3

Cecelia first assigns the county court erred in receiving exhibit 3 into evidence without proper foundation and authentication. Neb. Evid. R. 901, Neb. Rev. Stat. § 27-901 (Reissue 2016), requires authentication or identification of evidence sufficient to support a finding that a matter is what the proponent claims as a condition precedent for admission. *State v. Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017). But authentication or identification under rule 901 is not a high hurdle. *Id*. If the evidence is sufficient to support a finding that the evidence is what it purports to be, the rule is satisfied. *Id*. Under rule 901(2)(a), a proponent may authenticate a document by the testimony of someone with personal knowledge that it is what it is claimed to be, such as a person familiar with its contents. *State v. Casterline*, 293 Neb. 41, 878 N.W.2d 38 (2016). Additionally, under rule 901(2)(d), a proponent may authenticate a document by circumstantial evidence, or its "appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." *Id*. at 57, 878 N.W.2d at 50. Authentication rulings are necessarily fact specific, so a trial court has discretion to determine whether evidence has been properly authenticated. *Id*.

Exhibit 3 is a collection of images that appear to be taken from Cecelia's social media accounts. The first image is of her in a cap and gown with a caption stating, "Graduated from my Domestic Violence class today!!" Its time stamp shows that it was posted from an account named

"Cecelianicoleg" on October 19, 2017. The second image depicts a post from the same account with a CashApp QR code accompanied by the following caption: "Going through a little bit a family crisis don't want to go to much in to detail but im trying to get my son home from Nebraska before Christmas, anything will help and be GREATLY appreciated!" The time stamp associated with this image only shows that it was posted 5 hours before the screenshot. The third image, posted from the same account, appears to depict a picture of a speedometer gauged at 115 miles per hour. The time stamp associated with that image shows it is from March 24, but it does not indicate which year. The next image, dated April 13, 2021, is a post from a Facebook account named "Cecelia Nicole" that states, "On my way to Surgery." The following image, from the same account, was posted on August 24, 2020, and includes two pictures of Cecelia and Kato with the following caption: "A year ago today I met My love! Drunk as fuck after I jumped on stage while Dru Down was on rappin on stage lmaooo! And now we're having our first baby girl together. . . ." The last picture was posted from the same account on August 31, 2021, and depicts her and Kato embracing.

The foundational evidence set forth at trial was sufficient to support a finding that the images were what they purported to be; posts from Cecelia's social media accounts. Annetta testified that she pulled these images from Cecelia's social media accounts with the help of her niece. The accounts associated with the posts bear Cecelia's name, several of the images depict pictures of her and Kato, and at least four of the captions are distinctive to life events she experienced. As such, the images and captions within the posts provide sufficient circumstantial evidence that the social media accounts belong to Cecelia and that she made the posts. We find that exhibit 3 was sufficiently authenticated and the county court did not abuse its discretion in overruling Cecelia's foundation and authentication objections.

### 2. JUDICIAL BIAS

Cecelia assigns "the record establishes judicial bias or prejudice as a matter of law." Specifically, Cecelia contends: "[T]he appearance of bias was poignant at trial and ubiquitous throughout the entirety of its order. The record shows many examples of the [county] court's deep-seated antagonism against [Cecelia] so as to make rendering a fair judgment impossible." Brief for appellant at 17.

Cecelia points to three situations where the county court allegedly demonstrated judicial bias or prejudice. First, she argues the court gave Annetta's attorney "coaching and encouragement" during trial. When the lawyer attempted to offer exhibit 3, Cecelia's counsel objected citing to a lack of foundation and authentication. In ruling on the objection, the court stated, "I'll sustain the objection, but I think you can get there pretty easily, [counsel]." Cecelia argues this "coaching and encouragement" gave the appearance that the court "would likely accept the exhibit without the same rigor expected of all lawyers at trial." Brief for appellant at 17.

The second instance Cecelia cites to occurred during Annetta's attorney's closing argument and concerned Cecelia's decision to get a breast augmentation while not providing financial support for her children:

> [Annetta's Counsel]: . . . I'm not paying anything towards this child's wellbeing or upbringing, but I'm going to go spend $5,600 on a breast augmentation, and somehow that's in my child's best interest. That makes no sense.

> [Cecelia's Counsel]: I would object, Judge, that wasn't the testimony. I believe the testimony from my client was that the — in the exhibit, the Venmo app. she received the $5,600 from somebody over the Venmo.
> [Annetta's Counsel]: I mean, that's even better.
> THE COURT: Correct.

It is not entirely clear which attorney the court was responding to, but Cecelia contends the court responding "correct" was inappropriate.

Lastly, Cecelia takes issue with several of the factors the court relied upon in its order which found that she was presently unfit to perform parental duties. Specifically, she argues the court's focus on her occupation as an exotic dancer working at a strip club, receipt of welfare benefits, decisions to receive cosmetic surgery, and acceptance of funds from an unknown third-party to afford cosmetic surgery illustrates a projection of "an inappropriate stigma against people who ask for financial and economic assistance to survive." Brief for appellant at 18. We find the record does not support a finding of judicial bias. When evaluating a trial judge's alleged bias, the question is whether a reasonable person who knew the circumstances of the case would question the judge's impartiality under an objective standard of reasonableness, even though no actual bias or prejudice was shown. *State v. Ezell*, 314 Neb. 825, 993 N.W.2d 449 (2023). In other words, the question is not simply whether someone could conceivably question a judge's impartiality. *Id.* A defendant seeking to disqualify a judge on the basis of bias or prejudice bears the heavy burden of overcoming the presumption of judicial impartiality. *Id.* However, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion directed to a trial judge. *State v. Thomas*, 311 Neb. 989, 977 N.W.2d 258 (2022).

We find Cecelia's allegations are insufficient to overcome the heavy burden to show bias by the trial judge. Under the prevailing standard, we do not believe the judge's comment during the proceeding which Cecelia labels as "coaching and encouragement" rises to the level of disqualifying conduct when his impartiality is being questioned. Likewise, his utterance of the word "correct" does not reasonably bring his impartiality into question. Particularly, when it is not clear which attorney's comment he is referencing as being "correct."

We also do not find that the court's focus in its order on Cecelia's occupation, receipt of welfare benefits, decisions to receive cosmetic surgery, and acceptance of funds from unknown third-parties were inappropriate factors to consider that overcome the presumption of judicial impartiality. We do not believe a reasonable person who knew the circumstances of the case, viewing the judge's impartiality under an objective standard of reasonableness, would view the court's reliance on these factors as a demonstration of bias against Cecelia. Instead, a reasonable person would view the court's reliance on those facts as an effort to illustrate Cecelia's lack of maturity and questionable decision-making skills. Therefore, we cannot conclude that a reasonable person who knew the circumstances of the case would question the judge's impartiality under an objective standard of reasonableness.

### 3. UNFIT TO PERFORM PARENTAL DUTIES

Cecelia assigns the county court erred in finding that she was unfit to perform parental duties. A guardianship is no more than a temporary custody arrangement established for the

well-being of a child. *In re Guardianship of Elizabeth H.*, 17 Neb. App. 752, 771 N.W.2d 185 (2009).

The parental preference principle applies to guardianship proceedings that affect child custody. *Id.* This includes a proceeding to determine whether to appoint a guardian over a parent's objection. *Id.* The parental preference principle establishes a rebuttable presumption that the best interests of a child are served by reuniting the child with his or her parent. *Id.* The principle provides that a parent has a natural right to the custody of his or her child which trumps the interest of strangers to the parent-child relationship and the preferences of the child. *Id.* An individual who seeks appointment as a guardian over the objection of a biological or adoptive parent bears the burden of proving by clear and convincing evidence that the biological or adoptive parent is unfit or has forfeited his or her right to custody. *Id.* Absent such proof, the constitutional dimensions of the relationship between parent and child require a court to deny the request for a guardianship. *Id.* Parental unfitness is defined as "a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being." *In re Guardianship of K.R.*, 304 Neb. 1, 12, 932 N.W.2d 737, 745 (2019).

Evidence of unfitness should be focused upon a parent's present ability to care for a child, and not any other moral failings a parent may have. *Tilson v. Tilson*, 307 Neb. 275, 948 N.W.2d 768 (2020); *In re Interest of Lakota Z. & Jacob H.*, 282 Neb. 584, 804 N.W.2d 174 (2011). Evidence of a parent's past failings is pertinent only insofar as it suggests present or future faults. *Id.* While the analysis focuses on a parent's present ability, a pattern of poor decision making can support a finding of a parent's unfitness when awarding custody to a guardian. See *In re Guardianship of Elizabeth H., supra*.

The record provides competent evidence to support the court's determination that Cecelia was unfit to obtain custody of Kayn at the time of the hearing. Cecelia has displayed a pattern of questionable conduct, a lack of maturity, and a disinterest in the life of her son.

We begin by noting Cecelia's problematic decision of entrusting Kato with the care of her young children while she is at work. It was uncontested that Kato uses marijuana daily. Although Cecelia indicated that Kato does not use marijuana while taking care of the children, the county court found that someone who is under the influence of marijuana daily should not be solely responsible for providing care to young children. We agree. While responsible for the maintenance and safety of dependent small children, Kato's daily use of marijuana poses risks to these children.

Beyond Kato's daily use of marijuana, there were also indications that he uses "lean." While it is not known whether Kato has consumed "lean" in the presence of the children, the presence of the drug in their home and his willingness to share images of it online supplements the questionable nature of Cecelia's decision to entrust him with the care of her children. Additionally, despite being unemployed, Kato has shared multiple images online of him holding large sums of money. While Cecelia testified this money was fake production money, the county court found that conclusion not to be credible. It is not in the purview of the appellate court to determine the credibility of witnesses on appeal, as such determinations are for the finder of fact. *State v. Duckworth*, 29 Neb. App. 27, 950 N.W.2d 650 (2020). This leaves unresolved questions as to the source of the money in the photos, which in turn raises further suspicions as to Kato's suitability for the care of two small children.

Further, Cecelia's failure to form a plan to obtain the additional finances necessary to house and raise an additional child displays a lack of maturity. We first note that a court has never deprived a parent of the custody of a child merely because of financial or other grounds a stranger might better provide. *In re Guardianship of D.J.*, 268 Neb. 239, 682 N.W.2d 238 (2004). Therefore, we put no credence in the fact that Cecelia only makes $39,000 a year, is on welfare, and is the sole breadwinner for Kato, their child, and herself. While we do not rely on those facts, the lack of a plan to deal with the additional costs associated with having custody of Kayn is indicative of a lack of maturity. When asked about how she will parent an additional child if she is already financially insecure, she responded, "He's my son, I'll figure it out. That's what parents do." However, her testimony about voluntarily giving up custody of her other son due to frequent visits by CPS calls this purported dedication to parenting into question. She also stated that if she received custody of Kayn, she would change her work hours to better accommodate his care and would make strides to change her occupation. She discussed going to school to become a paralegal but has not taken any steps to achieve that goal. The fact that she has failed to take any steps to change her work schedule or occupation while already caring for one of her children gives little reason to believe that she will do so upon gaining custody of Kayn.

Also indicative of Cecelia's questionable decision making and maturity is her willingness to allow a customer at the strip club to pay for her $5,600 breast augmentation. While we do not necessarily weigh Cecelia's occupation as an exotic dancer against her, the degree that she allows her job to influence her personal life is relevant. Having a stranger pay for such a procedure is certainly abnormal and constitutes questionable decision making on her part.

Additionally, Cecelia has made decisions that have adversely affected her relationship with Kayn. She has had minimal contact with him since February 2020 and displayed an indifference toward his schooling and other activities. The parenting plan provided for Cecelia to have parenting time with Kayn for 8 weeks during the summer as well as over fall and spring breaks, and Christmas. Despite this plan, Cecelia only exercised her parenting time for six weeks in summer 2021 and the full 8 weeks in summer 2022. This meant that Cecelia did not see Kayn from February 2020 until the summer 2021 and then again from summer 2021 until summer 2022.

Cecelia also did not make the effort to travel to Nebraska to visit Kayn or to pick him up for her scheduled parenting time. She stated that although she wanted to visit Kayn, traveling to Nebraska was expensive. As such, Annetta was the one who transported Kayn to California on both occasions and even brought him back to Nebraska following his summer 2021 visit. And despite being obligated to pay for Kayn's travel expenses, Cecelia's only contribution was a one-time payment of $400. We find it noteworthy that Cecelia was able to obtain funds for a cosmetic surgery but was unwilling to pay for Kayn's travel expenses as required, and found the cost of visiting him to be prohibitive.

Further, while the COVID pandemic and its aftermath may explain Cecelia's physical absence during 2020, it does not excuse the extended absence of phone calls or other means of communication during and after that period. During those extended periods, Cecelia's communication with Kayn was limited to inconsistent phone and FaceTime calls. Annetta asserted that "sometimes four, five, six weeks" would go by between calls. When that occurred, Annetta was the one who initiated the calls to Cecelia. Although Cecelia denied this assertion and claimed she called Kayn at least once or twice a week, the county court determined Annetta's testimony

was more credible. While we are presented with conflicting evidence, our standard of review in this matter does not allow us to reweigh this evidence or make our own factual findings. See *In re Guardianship of K.R.*, 304 Neb. 1, 932 N.W.2d 737 (2019). Therefore, we are limited to the county court's determination that Annetta's testimony regarding the frequency of calls was more credible. Cecelia has also not shown an interest in Kayn's school or recreational activities. While Kayn has lived in Nebraska, she has never reached out to his school, his teachers, or attended any virtual parental-teacher conferences. More so, she has never asked Annetta for any of his school reports or projects.

Additionally, Kayn's conduct further demonstrates the lack of a relationship with Cecelia. Beyond him never asking for his mother since living in Nebraska, his expression of physical discomfort when tasked with drawing himself with Cecelia is illustrative. This is compounded by his statement to Annetta that he did not wish to return to California.

We conclude that at the time of the hearing, there was competent, clear, and convincing evidence that Cecelia possessed a personal deficiency or incapacity that would prevent her from performing reasonable parental obligations in child rearing, which would result in detriment to Kayn's well-being. However, recognizing the temporary nature of guardianships, this does not preclude Cecelia's future ability to regain custody of Kayn if steps are taken to better establish a more stable environment and an appropriate parental relationship.

## VI. CONCLUSION

For the reasons outlined above, we find that the trial judge did not demonstrate judicial bias and the county court did not err when it received exhibit 3 into evidence and found Cecelia to be presently unfit to perform parental duties. Accordingly, we affirm.

AFFIRMED.