Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/03/2023 09:08 AM CDT

State of Nebraska, appellee, v.
David Carlson, appellant.
___ N.W.2d ___

Filed October 3, 2023.    No. A-22-774.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. But whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Motions to Suppress: Trial: Pretrial Procedure: Appeal and Error.** When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from the trial and from the hearings on the motion to suppress.

3. **Rules of Evidence: Appeal and Error.** When the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.

4. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, and such matters are for the finders of fact.

5. **Constitutional Law: Search and Seizure.** The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures.

6. **Constitutional Law: Police Officers and Sheriffs: Search and Seizure: Appeal and Error.** To determine whether an encounter between an officer and a citizen reaches the level of a seizure under

the Fourth Amendment to the U.S. Constitution, an appellate court employs the analysis set forth in *State v. Van Ackeren*, 242 Neb. 479, 495 N.W.2d 630 (1993), which describes the three levels, or tiers, of police-citizen encounters.

7. **Constitutional Law: Police Officers and Sheriffs: Search and Seizure.** The first tier of police-citizen encounters involves no restraint of the liberty of the citizen involved; rather, the voluntary cooperation of the citizen is elicited through noncoercive questioning. This type of contact does not rise to the level of a seizure and therefore is outside the realm of Fourth Amendment protection.

8. **Constitutional Law: Criminal Law: Police Officers and Sheriffs: Investigative Stops: Search and Seizure: Words and Phrases.** The second tier of police-citizen encounters, the investigatory stop, as defined by the U.S. Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), is limited to brief, nonintrusive detention during a frisk for weapons or preliminary questioning. This type of encounter is considered a "seizure" sufficient to invoke Fourth Amendment safeguards, but because of its less intrusive character, it requires that the stopping officer only have specific and articulable facts to give rise to reasonable suspicion that a person has committed or is committing a crime.

9. **Evidence: Proof.** The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

10. **Rules of Evidence: Proof.** Neb. Evid. R. 901, Neb. Rev. Stat. § 27-901 (Reissue 2016), does not impose a high hurdle for authentication or identification.

11. ____: ____. A proponent of evidence is not required to conclusively prove the genuineness of the evidence or to rule out all possibilities inconsistent with authenticity. If the proponent's showing is sufficient to support a finding that the evidence is what it purports to be, the proponent has satisfied the requirement of Neb. Evid. R. 901(1), Neb. Rev. Stat. § 27-901(1) (Reissue 2016).

12. **Trial: Evidence.** Authentication rulings are necessarily fact specific, so a trial court has discretion to determine whether evidence has been properly authenticated.

13. **Drunk Driving: Convictions: Circumstantial Evidence.** One accused of a crime, including the crime of driving under the influence, may be convicted on the basis of circumstantial evidence if, taken as a whole, the evidence established guilt beyond a reasonable doubt.

Appeal from the District Court for Sarpy County, GEORGE A. THOMPSON, Judge, on appeal thereto from the County Court for Sarpy County, TODD J. HUTTON, Judge. Judgment of District Court affirmed.

Cole S. Burmeister, Sarpy County Public Defender, for appellant.

Michael T. Hilgers, Attorney General, and Nathan A. Liss for appellee.

PIRTLE, Chief Judge, and MOORE and RIEDMANN, Judges.

RIEDMANN, Judge.

## I. INTRODUCTION

Daniel Carlson appeals his conviction for driving under the influence of alcohol (DUI) entered by the Sarpy County Court and affirmed by the district court. He contends that the county court erroneously overruled his motion to suppress and improperly admitted four exhibits into evidence. Also, he claims the evidence was insufficient to support his conviction. Following our review, we affirm.

## II. BACKGROUND

On September 11, 2020, Sgt. Jason Melrose of the Bellevue Police Department responded to an anonymous call that reported a white male, who appeared intoxicated while walking around a local grocery store, had exited the store and was now seated in a motor vehicle in the store's parking lot. The caller disclosed that the man had left the store and got in a white Hyundai Elantra parked in a handicapped parking stall. The caller also provided the license plate number on the vehicle.

When Melrose pulled into the grocery store parking lot shortly before 11 p.m., he identified a white Hyundai Elantra that had a license plate matching the license plate number provided and was parked in a handicapped parking stall. A white male was in the driver's seat of the vehicle, which was not

running. Melrose parked a few stalls down from the Hyundai Elantra, then approached the vehicle on foot. Carlson opened his door and eventually identified himself.

When Melrose asked Carlson if he was "okay," Carlson responded that he was fine and that he was just waiting until he could leave to go home. Because Melrose could smell alcohol emanating from Carlson's breath, he asked whether Carlson had consumed any alcohol that night. Carlson responded he had four drinks earlier that evening at a casino, and his last drink was at approximately 9 p.m. During this conversation, Melrose asked where the keys to the vehicle were, and Carlson pointed to the ground outside of the vehicle. Melrose picked up the keys and placed them on the roof of the vehicle.

Carlson explained that he had not driven from the casino to the grocery store; rather, his friend "Joe" had driven his vehicle and dropped him off at the grocery store. However, when Melrose asked for Joe's identifying information—such as his last name, his address, or his phone number—Carlson could not provide any information. When asked how he called Joe, Carlson told Melrose that he called him from a pay phone and pointed toward the front of the grocery store. But there was no pay phone near the grocery store.

Officer Aaron Jezek arrived at the scene after Melrose, and once he observed impairment, he took over the DUI investigation. Carlson was eventually asked to step out of his vehicle but refused. The officers then forcefully removed Carlson from his vehicle after giving him multiple opportunities to exit. At the scene, Jezek administered a preliminary breath test, which resulted in a blood alcohol content (BAC) of .126. Based on the results of the breath test, he was arrested for DUI.

Upon arrival at the jail, Jezek administered a DataMaster test to measure Carlson's BAC. Jezek prepared the "Infrared Absorption Checklist Technique" while measuring Carlson's BAC with the DataMaster machine. Carlson's BAC was .112. Carlson was ultimately charged with DUI.

### 1. Motion to Suppress

Carlson filed a "Motion to Suppress Stop" in which he asserted that there was no reasonable suspicion to detain him, so his subsequent detention was in violation of his constitutional rights.

At the hearing on the motion to suppress, Melrose recounted the series of events leading up to and during his initial encounter with Carlson. During cross-examination, Carlson focused on the credibility of the anonymous caller, because dispatch had received no details about Carlson that implied he was intoxicated, other than the caller's conclusion that he appeared intoxicated and had stumbled in the grocery store. Melrose conceded that he had not seen Carlson driving and had not seen Carlson commit any traffic violations. Ultimately, Carlson argued that the anonymous tip alone could not justify the stop, and corroboration of details that are easily obtainable at the time the information is provided will not support a finding of probable cause or furnish the basis for reasonable suspicion.

After taking the matter under advisement, the county court issued an order denying Carlson's motion to suppress. Aligned with Nebraska and U.S. Supreme Court precedent, the county court considered the totality of the circumstances in analyzing the encounter between Melrose and Carlson. It reasoned that the initial encounter with Carlson was lawful as part of law enforcement's caretaking capacity authority. It further found that Melrose's continued detainment of Carlson was based upon a reasonable, articulable suspicion that Carlson had been driving while he was intoxicated because Melrose smelled alcohol emanating from Carlson. Therefore, the county court overruled the motion to suppress.

### 2. Trial

A bench trial was held on January 5, 2022. At the beginning of trial, the county court received exhibit 1, a copy of title 177 of the Nebraska Administrative Code, which provides the relevant rules and regulations for measuring a subject's BAC. See 177 Neb. Admin. Code, ch. 1 (2016).

As Melrose began his testimony recounting the events leading to Carlson's eventual arrest, Carlson's counsel reasserted his objection contained in the previous motion to suppress. He explained that there was no reasonable suspicion to detain Carlson and that his detention violated his constitutional rights under both the U.S. Constitution and the Nebraska Constitution. The county court overruled his objection, and Melrose continued his testimony.

### (a) Exhibits 2 and 3

Christopher Abbott, who works as a DataMaster maintenance officer for the Bellevue Police Department, testified about Carlson's BAC results from the night of his arrest. Abbott prepared a packet of the BAC results and documentation that verified the machine was certified and calibrated properly. The packet was later admitted as exhibit 2.

Abbott explained that a Class B permit allows officers to operate the DataMaster. Contained within exhibit 2 was a copy of the Class B permit for the officer who operated the DataMaster test to measure Carlson's BAC. Abbott's permit was also included in exhibit 2, and Jezek's Class B permit was admitted into evidence as exhibit 3.

All three licenses contain the word "VOID" printed behind the text of the licenses. Carlson made a foundational objection to both exhibits 2 and 3 because of the "VOID" stamps. The county court overruled Carlson's objection.

Although Abbott testified that he did not know why the Class B permits had "VOID" displayed on them, Jezek explained that the original permits had a watermark that was revealed only when the permits were photocopied. Both Abbott and Jezek testified that the permits were valid—they did not expire and did not need recertification, so there was no reason for the permits to be invalid.

### (b) Exhibits 4 and 5

Exhibit 4 was the "Infrared Absorption Checklist Technique" that Jezek completed while administering the DataMaster

test to measure Carlson's BAC. Jezek recorded the results of the DataMaster test on the checklist, which ultimately read .112 of a gram of alcohol per 210 liters of breath. Exhibit 5 contained the results from the DataMaster test.

Carlson objected to the admission of both exhibits because he contended there was not any evidence that Jezek was authorized to perform the DataMaster test or that the test was conducted pursuant to title 177. The county court overruled Carlson's objections.

### (c) Conviction and Sentencing

The county court found Carlson guilty of DUI and sentenced him to 7 days of house arrest and a $500 fine, plus court costs. Additionally, Carlson's driver's license was revoked for 6 months, and he was ordered to apply for an ignition interlock device to be installed in his vehicle. Carlson appealed his conviction to the district court.

### 3. APPEAL TO DISTRICT COURT

On appeal, Carlson raised three errors: (1) The county court erred in overruling his motion to suppress; (2) the county court erred in receiving exhibits 2, 3, 4, and 5; and (3) there was insufficient evidence to support his conviction. The district court found that the county court properly overruled Carlson's suppression motion, as it correctly found that the law enforcement officers had a reasonable and articulable suspicion that Carlson was intoxicated. It also found Carlson's argument about exhibits 2 and 3 without merit because despite having "VOID" on the Class B permits, Jezek testified he was a valid permit holder, thereby negating the need for a copy of his permit. It was also persuaded by the State's explanation for the "VOID" language appearing on the permits. The court further found that the officer's testimony was sufficient for the admission of exhibits 4 and 5. Finally, the district court found there was sufficient evidence to support the conviction because circumstantial evidence supported a finding

that Carlson drove to the grocery store while he was intoxicated. Carlson now appeals to this court.

## III. ASSIGNMENTS OF ERROR

Carlson assigns the same three errors he presented to the district court. He claims the county court erred in (1) overruling his motion to suppress and (2) accepting exhibits 2, 3, 4, and 5 into evidence. He also claims there was insufficient evidence to support his conviction.

## IV. STANDARD OF REVIEW

[1,2] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, we apply a two-part standard of review. *State v. Shiffermiller*, 302 Neb. 245, 922 N.W.2d 763 (2019). Regarding historical facts, we review the trial court's findings for clear error. *Id*. But whether those facts trigger or violate Fourth Amendment protections is a question of law that we review independently of the trial court's determination. *State v. Shiffermiller, supra*. When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from the trial and from the hearing on the motion to suppress. *Id*.

[3] When the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *State v. Casterline*, 293 Neb. 41, 878 N.W.2d 38 (2016). An appellate court reviews the trial court's conclusions with regard to evidentiary foundation and witness qualification for an abuse of discretion. *Id*.

[4] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, and such matters are for the finders of fact. *State v. Bryant*,

311 Neb. 206, 971 N.W.2d 146 (2022). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*.

## V. ANALYSIS

### 1. Motion to Suppress

Prior to trial, Carlson filed a "Motion to Suppress Stop" in which he asserted that his detention was in violation of his constitutional rights. He sought an order "suppressing the stop of [Carlson]." At the hearing on the motion, Carlson's counsel argued that the anonymous tip law enforcement received did not provide "probable cause to initiate the detention that . . . Melrose initiated with . . . Carlson." The court overruled his motion.

At trial, before Melrose began to testify regarding his interaction with Carlson, Carlson objected, reasserting "the objection contained in [his] prior motion to suppress." The court overruled the objection. Carlson did not make a similar objection when Jezek testified as to the interactions he had with Carlson when he subsequently arrived at the scene.

On appeal, Carlson argues that Melrose did not have reasonable suspicion to detain him; thus, the county court erred when it overruled his motion to suppress. The State contends that Carlson failed to preserve this alleged error because he did not object to Jezek's testimony, nor did he assert his constitutional arguments in an objection to the BAC test results. We disagree.

At both the motion to suppress hearing and on appeal, Carlson focuses solely on Melrose's actions and not those of Jezek, who arrived at the scene after Melrose made the initial contact with Carlson. We interpret Carlson's "Motion to Suppress Stop" to be directed at Melrose's initial actions in approaching and detaining Carlson. We therefore address this assigned error.

### (a) *Van Ackeren* Tiers

[5] The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures. *State v. Gilliam*, 292 Neb. 770, 874 N.W.2d 48 (2016).

[6,7] To determine whether an encounter between an officer and a citizen reaches the level of seizure under the Fourth Amendment to the U.S. Constitution, an appellate court employs the analysis set forth in *State v. Van Ackeren*, 242 Neb. 479, 495 N.W.2d 630 (1993), which describes the three levels, or tiers, of police-citizen encounters. *State v. Shiffermiller*, 302 Neb. 245, 922 N.W.2d 763 (2019). The first tier of police-citizen encounters involves no restraint of the liberty of the citizen involved; rather, the voluntary cooperation of the citizen is elicited through noncoercive questioning. *Id*. This type of contact does not rise to the level of a seizure and therefore is outside the realm of Fourth Amendment protection. *State v. Shiffermiller, supra*.

[8] The second tier, the investigatory stop, as defined by the U.S. Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), is limited to brief, nonintrusive detention during a frisk for weapons or preliminary questioning. *State v. Shiffermiller, supra*. This type of encounter is considered a "seizure" sufficient to invoke Fourth Amendment safeguards, but because of its less intrusive character, it requires that the stopping officer only have specific and articulable facts to give rise to reasonable suspicion that a person has committed or is committing a crime. See *id*. The third tier, arrests, is characterized by a highly intrusive or lengthy search or detention. See *id*. The Fourth Amendment requires that an arrest be justified by probable cause to believe that a person has committed a crime or is committing a crime. *Id.* As noted, only the second and third tiers of police-citizen encounters are seizures sufficient to invoke Fourth Amendment protections. *State v. Shiffermiller, supra*.

(b) Carlson's Stop Began as
Tier-One Encounter

Carlson argues that there was no reasonable suspicion to detain him, so his detention violated his Fourth Amendment rights. Essentially, Carlson argues that Melrose's interaction with him began as a tier-two encounter; thus, it required reasonable suspicion, which Carlson contends was not established by the anonymous caller's tip alone. We disagree with Carlson's classification of the initial encounter.

In *State v. Gilliam, supra*, the Nebraska Supreme Court held that a tier-one encounter occurred when a police officer approached a vehicle parked legally on the side of the road after the officer activated his patrol unit's overhead lights. It was noted that the police officer was questioning the driver in a public place, the officer approached the vehicle alone and on foot, and he knocked on the driver's window and asked to see some identification. *Id*. There was no evidence that the officer displayed his weapon, used a forceful tone, touched the driver, or otherwise told him he was not free to leave. *Id*. The Supreme Court held that despite the officer's activation of his partol unit's overhead lights, the stop began as a tier-one encounter in which the driver was not seized and his Fourth Amendment rights were not implicated. *Id*.

Akin to *State v. Gilliam, supra*, the circumstances in this case evince an initial tier-one encounter; thus, Melrose did not need reasonable suspicion to approach Carlson and ask him to identify himself. Melrose did not park behind Carlson, and instead, he parked "a few stalls down" from where Carlson was parked. Carlson was approached in a public parking lot, and Melrose approached on foot, alone, and without his weapon drawn. There was no evidence that Melrose used a forceful tone, touched Carlson, or indicated that he was not free to leave while he was trying to identify him. Since the initial encounter was a tier-one encounter, Carlson's Fourth Amendment rights were not implicated at that time.

We note that Carlson takes issue with the use of an anonymous tip as the basis for Melrose's initial contact with him. He claims that corroboration of details easily obtainable at the time an anonymous tip is provided will not support a finding of reasonable suspicion, much less probable cause. However, because the initial encounter was a tier-one encounter, reasonable suspicion was not required and we need not address the credibility or reliability of the anonymous tip. See *State v. Casillas*, 279 Neb. 820, 782 N.W.2d 882 (2010) (declining to address reliability of anonymous tip because encounter was tier-one encounter for which reasonable suspicion was not required).

Carlson's motion to suppress sought to suppress "the stop," and the hearing addressed only Melrose's involvement with Carlson. In his brief on appeal, Carlson states:

> Melrose testified that he approached the vehicle on foot and shined his light into the vehicle at which point the individual inside the vehicle, later identified as . . . Carlson, opened the door. . . . Melrose testified to substantially the same at trial. For the purpose of evaluating the Motion to Suppress Evidence, no further factual inquiry is necessary as any further evidence gleaned from this interaction would be fruit of the poisonous tree. The only relevant consideration is whether the detention of [Carlson] was valid under the circumstances.

Brief for appellant at 12.

Because Carlson limits his argument on the motion to suppress to the initial contact by Melrose, we need not analyze Carlson's continued detention once officers detected the smell of alcohol. Thus, although our reason is different, we agree with the district court that the county court did not err in denying Carlson's motion to suppress. See *State v. Marshall*, 269 Neb. 56, 690 N.W.2d 593 (2005) (where record adequately demonstrates that decision of trial court is correct, although such correctness is based on ground or reason different from that assigned by trial court, appellate court will affirm).

## 2. Evidentiary Objections

Carlson's argument as to why exhibits 2, 3, 4, and 5 were improperly admitted into evidence is twofold. First, he claims that exhibits 2 and 3 were improperly admitted because the copies of the Class B permits displayed "VOID" on them; thus, they were not properly authenticated. Second, he argues that because exhibits 2 and 3 were improperly admitted, then exhibits 4 and 5, which were Carlson's BAC results, were invalid because the operator and maintenance officer did not have valid Class B permits under title 177. We find no reversible error in the county court's rulings.

### (a) Exhibits 2 and 3

[9-11] The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. Neb. Evid. R. 901, Neb. Rev. Stat. § 27-901 (Reissue 2016). See, also, *State v. Casterline*, 293 Neb. 41, 878 N.W.2d 38 (2016). However, rule 901 does not impose a high hurdle for authentication or identification. *State v. Casterline, supra.* A proponent of evidence is not required to conclusively prove the genuineness of the evidence or to rule out all possibilities inconsistent with authenticity. *Id*. If the proponent's showing is sufficient to support a finding that the evidence is what it purports to be, the proponent has satisfied the requirement of rule 901(1). *State v. Casterline, supra.*

[12] A proponent may authenticate a document under rule 901(2)(a) by the testimony of someone with personal knowledge that it is what it is claimed to be, such as a person familiar with its contents. *State v. Casterline, supra.* Additionally, under rule 901(2)(d), a proponent may authenticate a document by circumstantial evidence, or its "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Authentication rulings are necessarily fact specific, so a trial

court has discretion to determine whether evidence has been properly authenticated. *State v. Casterline, supra.*

Under title 177 of the Nebraska Administrative Code, each site that tests for a subject's BAC must have a maintenance officer that holds a Class B permit. 177 Neb. Admin. Code, ch. 1, § 009.01. Additionally, the operator of a DataMaster test shall be a Class B permit holder. *Id.*, § 008.03. A Class B permit allows the holder to perform a chemical test to analyze a subject's breath for alcohol content by an approved method. *Id.*, § 001.07B. Permits are nonexpiring, so any permit issued under prior regulations remains valid, as long as the permit is not revoked for noncompliance with the rules and regulations. *Id.*, § 004.01.

Carlson's argument turns on whether the "VOID" text on the Class B licenses impacts the validity of his breath tests. However, because both Abbott, the maintenance officer for the DataMaster, and Jezek, the operating officer, testified that their licenses were valid, Carlson's argument is without merit. Jezek explained that the "VOID" text behind the lettering of the permits was just a watermark to prevent the permits from being photocopied. There was no other evidence provided to refute Abbott's and Jezek's claims that their licenses were valid. Furthermore, title 177 provides that Class B permits are nonexpiring. Therefore, the county court did not abuse its discretion in admitting exhibits 2 and 3 into evidence.

### (b) Exhibits 4 and 5

Carlson's argument explaining why exhibits 4 and 5 are inadmissible is premised on exhibits 2 and 3 being inadmissible. Carlson relies on title 177 to contend that without proof that Abbott and Jezek held valid Class B permits, then there was inadequate foundation for the admission of Carlson's test results. However, as explained above, the county court did not err in admitting exhibits 2 and 3, because the "VOID" text behind the lettering of the license was a watermark according to Jezek. Because exhibits 2 and 3 were properly

admitted, Carlson's argument fails. Therefore, the county court did not abuse its discretion in admitting exhibits 4 and 5 into evidence.

### 3. Sufficiency of Evidence

Carlson argues that the county court could not have found there was sufficient evidence to convict him of DUI, because he was not in actual physical control of a motor vehicle. Carlson contends that because his car keys were found outside of the vehicle, he was prevented from operating his vehicle with very little effort or delay.

[13] Under Neb. Rev. Stat. § 60-6,196 (Reissue 2021), it shall be unlawful for any person to operate or be in the actual physical control of any motor vehicle while under the influence of alcohol with "a concentration of eight-hundredths of one gram or more by weight of alcohol per two hundred ten liters of his or her breath." And one accused of a crime, including the crime of DUI, may be convicted based on circumstantial evidence, if, taken as a whole, the evidence established guilt beyond a reasonable doubt. *State v. Miller*, 312 Neb. 17, 978 N.W.2d 19 (2022).

In *State v. Miller, supra*, the Nebraska Supreme Court held that circumstantial evidence was sufficient to convict the defendant of DUI. The evidence showed the defendant was the only person found at the accident scene, he was found injured and lying unconscious among debris from the vehicle, he told officers there was no one else with him, the vehicle was registered to his mother, and investigators could not find anyone else at the accident scene who could have been the driver. *Id*. The court reasoned that viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could find the defendant was operating the vehicle based on the circumstantial evidence beyond a reasonable doubt. *Id*.

Akin to *State v. Miller, supra*, circumstantial evidence establishes sufficient evidence for Carlson's DUI conviction. Here, Melrose admitted that he had not seen Carlson drive.

However, Carlson admitted that he had four drinks at a casino, the last of which was at approximately 9 p.m. He told officers that he had not consumed any alcohol while in the grocery store. When asked how he got to the grocery store from the casino, Carlson told officers his friend "Joe" had driven him. But when asked to provide contact information for Joe, Carlson could not provide any, including a last name or phone number. Instead, he told officers that he had called Joe from a pay phone and pointed toward the front of the grocery store, where there was no pay phone. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could find beyond a reasonable doubt that Carlson operated his vehicle while intoxicated to get to the grocery store. Because a conviction for DUI can be based upon a finding that the defendant either operated a motor vehicle or was in actual physical control of it, Carlson's assignment of error is without merit.

## VI. CONCLUSION

After reviewing the record, we find the district court did not err in affirming the county court's denial of Carlson's motion to suppress the stop and in finding no abuse of discretion in the county court's receipt of exhibits 2, 3, 4, and 5 into evidence. Additionally, there was sufficient evidence to convict Carlson of DUI; therefore, we affirm the order of the district court affirming Carlson's conviction and sentence in the county court.

AFFIRMED.